**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 30, 2017**

# In the Court of Appeals of Georgia

A17A1199. THE STATE v. OSTERLOH.

DILLARD, Chief Judge.

Following a hearing, the trial court granted Christopher Osterloh's motion to suppress the results of a State-administered blood test. The State now appeals the trial court's order, arguing that the court erred in finding that Osterloh did not voluntarily consent to the test. For the reasons set forth *infra*, we affirm.

At the outset, we note that when the facts material to a motion to suppress are disputed, "it generally is for the trial judge to resolve those disputes and determine the material facts."[1] This principle is well established, and our Supreme Court has identified "three corollaries of the principle, which limit the scope of review in

---

[1] *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015); *accord State v. Bowman*, 337 Ga. App. 313, 313 (787 SE2d 284) (2016).

appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts."[2] An appellate court generally must (1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit its consideration of the disputed facts to those expressly found by the trial court.[3] Moreover, an appellate court "may also consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape."[4] And we review *de novo* the trial court's "application of law to the undisputed facts."[5]

So viewed, the record shows that on January 19, 2014, Osterloh was traveling northbound on Georgia state route 400, when he was struck by another vehicle.

---

[2] *Hughes*, 296 Ga. at 746 (1); *accord Bowman*, 337 Ga. App. at 313.

[3] *Hughes*, 296 Ga. at 746 (1); *accord Bowman*, 337 Ga. App. at 313.

[4] *State v. Allen*, 298 Ga. 1, 2 (1) (a) (779 SE2d 248) (2015); *see also Hughes*, 296 Ga. at 746 (1) n.5 (noting that "to the extent that material facts could be discerned by appellate court from video recording, no deference to findings of trial court was required").

[5] *State v. Conner*, 322 Ga. App. 636, 637 (745 SE2d 837) (2013) (punctuation omitted); *accord Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

Osterloh's vehicle skidded off the roadway and stopped at the tree line, and Osterloh, who lost consciousness during the accident, awoke on the side of the road, with his head outside of the passenger window. Paramedics and firefighters responded to the scene, as did Forsyth County Sheriff's deputies. A deputy spoke to Osterloh, who indicated he was on his way to Chicago when his car was struck three times. In response to the deputy's questions, Osterloh was able to provide his name and report that he had a metal rod in his leg, had hit his head in the accident, and was not on any medication. Osterloh also walked with a significant limp and indicated that he had injured his leg.

After several minutes of conversation, the deputy asked Osterloh to stand in a particular spot, and Osterloh suddenly started screaming and ran toward the road, seemingly attempting to flag down a passing vehicle. Osterloh then became uncooperative, and refused to stand where the deputy asked him to stand, instead standing near the roadway, with his arms spread open. The deputy then told Osterloh to place his hands behind his back and get down on the ground, and four deputies pinned him to the ground, where he was handcuffed. Once he was forced to the ground, Osterloh began speaking and yelling in gibberish, which officers described as "speaking in tongues" or in a never-before-heard foreign language. This continued

3

for several minutes. The deputies told Osterloh to calm down, but he seemed unable to respond to their requests.

After Osterloh stopped yelling, the deputies rolled him onto his side so that he could breath. First responders checked Osterloh's vital signs and determined that he was breathing normally, but his pupils were dilated. The deputy then placed Osterloh under arrest and read Georgia's implied-consent notice for drivers over the age of 21. Osterloh interrupted the deputy and said, "I ain't going to trial fucking dumb ass. What you read that for?" The deputy then asked if Osterloh would submit to a State-administered blood test, and Osterloh replied, "yeah." The deputy did not promise Osterloh anything in exchange for a blood sample; he did not threaten Osterloh, or brandish his gun. But during the reading of the notice, at least one deputy and sometimes two deputies were holding Osterloh to the ground, and Osterloh was heaving and possibly vomiting. And in fact, while he was on the ground, Osterloh vomited a purple liquid. After the reading of the implied-consent notice, Osterloh remained pinned to the ground for approximately 15 minutes, occasionally shouting in gibberish, until an ambulance arrived to transport him to the hospital. At no point did Osterloh indicate that he did not wish to submit to the blood test.

At the hospital, Osterloh was combative and had to be immobilized, including during the blood draw. Osterloh spent three days in the intensive care unit and had to be placed in a medically induced coma. In addition to his head injury, he vomited blood, had blood in his urine, and suffered from respiratory failure.

Thereafter, the State charged Osterloh, via accusation, with driving under the influence of methamphetamine (DUI per se),[6] driving under the influence of a drug to the extent that he was a less-safe driver (DUI less safe),[7] reckless driving,[8] failure to maintain lane,[9] and operating a motor vehicle too fast for conditions.[10] Osterloh filed a motion to suppress the results of the State-administered blood test, arguing, *inter alia*, that he did not voluntarily consent to the blood draw.

During the hearing, both the deputy who administered the implied-consent warning and Osterloh testified. The deputy testified that Osterloh appeared to be listening to and comprehending the implied-consent notice. Osterloh, however,

---

[6] *See* OCGA § 40-6-391 (a) (6).

[7] *See* OCGA § 40-6-391 (a) (2).

[8] *See* OCGA § 40-6-390.

[9] *See* OCGA § 40-6-48 (1).

[10] *See* OCGA § 40-6-180.

5

testified that he had almost no recollection of the immediate aftermath of the accident, including the implied-consent notice. The State also played a recording of the interaction between Osterloh and the deputies, which was captured by camera on the dashboard of a deputy's vehicle.

At the close of the hearing, the trial court granted Osterloh's motion to suppress. Thereafter, the court issued an order finding that Osterloh was "clearly injured" and "incapable of making any kind of rational decision." With regard to the implied-consent notice, the trial court further expressly found that while it was being read, Osterloh was lying flat on the ground, alternately mumbling and screaming incomprehensibly, and appeared to be vomiting or choking at times. This appeal follows.[11]

In its sole enumeration of error, the State contends that the trial court erred in granting Osterloh's motion to suppress the results of the blood test, arguing that video evidence shows that Osterloh was fully capable of understanding and responding to the deputy's questions and requests, including the implied-consent warning, and that Osterloh voluntarily consented to the blood test. We disagree.

---

[11] *See* OCGA § 5-7-1 (a) (4) (permitting a direct appeal when the State's evidence has been ruled inadmissible).

It is now well established that a suspect's right under the Fourth Amendment to be free of unreasonable searches and seizures "applies to the compelled withdrawal of blood, and the extraction of blood is a search within the meaning of the Georgia Constitution."[12] Generally, searches are of two types: "those conducted with a search warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions."[13] Accordingly, a warrantless search is "presumed to be invalid and the State has the burden of showing otherwise."[14]

---

[12] *Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015); *see also Cooper v. State*, 277 Ga. 282, 285 (III) (587 SE2d 605) (2003) ("A suspect's Fourth Amendment right to be free of unreasonable searches and seizures applies to the compelled withdrawal of blood." (punctuation omitted)).

[13] *Williams*, 296 Ga. at 819; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (II) (91 SCt 2022, 29 LE2d 564) (1971) (noting that searches conducted without prior approval of a judge or magistrate are per se unreasonable).

[14] *Williams*, 296 Ga. at 819; *see also Mincey v. Arizona*, 437 U.S. 385, 393-94 (I) (98 SCt 2408, 57 LE2d 290) (1978) (noting that warrants are generally required to search a person's home or person).

It is also well settled that in the context of a DUI blood draw "a valid consent to a search eliminates the need for either probable cause or a search warrant."[15] And historically, Georgia's appellate courts considered "a defendant's affirmative response to the reading of the implied consent notice as sufficient to allow a search of his or her bodily fluids without further inquiry into the validity of the defendant's consent."[16] But in *Williams v. State*,[17] the Supreme Court of Georgia held that "mere compliance with statutory implied consent requirements does not, per se, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant."[18] Instead, the *Williams* Court concluded that the State must show that a suspect "gave *actual consent* to the procuring and testing of his blood, which would require the determination of the

---

[15] *Williams*, 296 Ga. at 821; *see also Cooper*, 277 Ga. at 291 (VI) (noting that a suspect's valid consent to search eliminates the need for either probable cause or a search warrant).

[16] *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016); *see, e.g.*, *Meiklejohn v. State*, 281 Ga. App. 712, 714 (637 SE2d 117) (2006), *abrogated by Williams*, 296 Ga. at 823.

[17] 296 Ga. 817.

[18] *Id.* at 822.

8

voluntariness of the consent under the totality of the circumstances."[19] And to make this determination, courts must "conduct a case-by-case analysis[.]"[20]

Under Georgia law, "voluntariness" must reflect "an exercise of free will, not merely a submission to or acquiescence in the express or implied assertion of authority."[21] Consequently,

> the voluntariness of consent to search is measured by evaluating the totality of the circumstances, which includes factors such as prolonged questioning; the use of physical punishment; the accused's age, level of education, intelligence, length of detention, and advisement of constitutional rights; and the psychological impact of these factors on the accused.[22]

In reviewing the record in this matter, including the video-recording of the deputy's interaction with Osterloh at the scene of the accident, there is no evidence as to Osterloh's age, level of education, or intelligence. And there is also no evidence that Osterloh was threatened or subjected to a lengthy detention. Furthermore, the

---

[19] *Id.* at 823.

[20] *Kendrick*, 335 Ga. App. at 769.

[21] *Bowman*, 337 Ga. App. at 317 (punctuation omitted).

[22] *Id.* (punctuation omitted); *accord Kendrick*, 335 Ga. App. at 769.

evidence is clear that Osterloh responded affirmatively to the deputy's request following the implied-consent warning.

But the uncontradicted evidence also shows that Osterloh had been in an accident, in which he sustained injuries, including a head injury so serious that he had to be placed into a medically induced coma and spend three days in the intensive care unit. Nevertheless, the State contends that there was no evidence Osterloh's injuries made him incapable of freely and voluntarily consenting to a blood draw. But even if this were true, given the evidence of Osterloh's significant injuries, it is the *State's* burden to prove that Osterloh gave his consent freely and voluntarily.[23]

The State also asserts that Osterloh was relaxed and calm at the time of the implied-consent notice. But this claim is belied by the video evidence upon which the State relies. While Osterloh appears to comprehend and respond to questions at the beginning of his encounter with the deputy, he is largely incoherent after he attempts to enter the roadway and is forced to the ground. And the video shows that, throughout the reading of the implied-consent notice, Osterloh is handcuffed and held to the ground by one or two deputies. During this time, although Osterloh sometimes

---

[23] *See Williams*, 296 Ga. at 821 ("[W]hen relying on the consent exception to the warrant requirement, the State has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances." (punctuation omitted)).

10

responds to the deputy's statements and questions, at other times he is babbling, retching, and yelling.

The State, of course, would have this Court focus primarily on Osterloh's affirmative response to the deputy's question and ignore the other evidence. This, we cannot do.[24] Indeed, in evaluating the totality of these circumstances, we are mindful that "in the absence of evidence of record *demanding* a finding contrary to the judge's determination, the appellate court will not reverse the ruling sustaining a motion to suppress."[25] And here, the evidence supports the trial court's findings and certainly does not demand a conclusion contrary to the court's ruling.[26]

---

[24] *See id.* at 823 (requiring that courts determine the voluntariness of the consent "under the totality of the circumstances").

[25] *State v. Durrence*, 295 Ga. App. 216, 218 (671 SE2d 261) (2008) (punctuation omitted); *accord Anderson v. State*, 267 Ga. 116, 119 (2) (475 SE2d 629) (1996).

[26] *See State v. Jung*, 337 Ga. App. 799, 802-03 (788 SE2d 884) (2016) (holding that evidence the defendant was highly intoxicated, confused, and unable to follow directions supported trial court's grant of defendant's motion to suppress); *Bowman*, 337 Ga. App. at 317-18 (holding that, despite evidence that defendant appeared to understand the implied-consent notice, totality of circumstances, including the seriousness of the accident and defendant's intoxication level, which required him to be taken to the hospital rather than jail, supported trial court's grant of defendant's motion to suppress). *But see State v. Depol*, 336 Ga. App. 191, 198-200 (784 SE2d 51) (2016) (reversing trial court's grant of defendant's motion to suppress where video evidence showed that defendant, despite being intoxicated, was capable of

Finally, and perhaps most importantly, nothing prevents the State from obtaining a warrant to draw a suspect's blood in situations such as this, in which the voluntariness of a suspect's consent is difficult to determine. And while obtaining a warrant no doubt imposes more of a burden on law-enforcement officers than simply reading the implied-consent notice, in those DUI "investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."[27]

For all these reasons, we affirm the trial court's order granting Osterloh's motion to suppress the results of the blood test.

*Judgment affirmed. Ray, P. J. and Self, J., concur.*

---

understanding what was said to him and responding appropriately).

[27] *Missouri v. McNeely*, 569 U.S. 141 (II) (B) (133 SCt 1552, 1561, 185 LE2d 696) (2013); *see also McDonald v. United States,* 335 U.S. 451, 456 (69 SCt 191, 93 LEd 153) (1948) ("We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made [the search] imperative").