**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 23, 2018**

# In the Court of Appeals of Georgia

A17A1821. DIAZ v. THE STATE.

REESE, Judge.

A jury found Robert Diaz guilty of homicide by vehicle in the first degree, driving under the combined influence ("DUI") of drugs to the extent that it was less safe for him to drive, and failure to maintain a lane.[1] He appeals from the judgment on his convictions, arguing that the trial court erred in admitting the results of a state-administered blood test, his statement to a law enforcement officer, and evidence that

---

[1] See OCGA §§ 40-6-393 (a) ("Any person who, without malice aforethought, causes the death of another person through the violation of [OCGA § 40-6-391] commits the offense of homicide by vehicle in the first degree[.]"); 40-6-391 (a) (4) ("A person shall not drive or be in actual physical control of any moving vehicle while [u]nder the combined influence of any [drugs] to the extent that it is less safe for the person to drive[.]"); 40-6-48 (1) ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]").

he was impaired by drugs on days other than the date of the collision at issue. For the reasons set forth, infra, we affirm.

Viewed in the light most favorable to the trial court's rulings on the motions to exclude the evidence at issue,[2] the record reveals the following facts. On the evening of May 24, 2014, the Appellant, while driving a white Toyota Tundra pickup truck, drove through a neighbor's yard and over the neighbor's mailbox. The Appellant walked to the front door of the house while carrying the mailbox and told the neighbor that he was sorry and was going to buy him a new mailbox. According to the neighbor, the Appellant was crying and "jittery," his eyes were red, and he asked the neighbor not to tell his (the Appellant's) wife what had happened. After the Appellant left, the neighbor called 911 and reported the incident.

At approximately 9:55 p.m. the same evening, a Georgia State Patrol trooper, Glen Hand, was driving to work when he came upon an accident scene involving a white Toyota Tundra pickup truck and a Hyundai automobile. He reported the accident to the dispatcher and asked for assistance by police and emergency

---

[2] See *McKibben v. State*, 340 Ga. App. 89 (796 SE2d 478) (2017) ("On appeal from a ruling on a motion to suppress, we construe the evidence most favorably to affirming the trial court's factual findings and judgment.") (punctuation and footnote omitted).

personnel. Trooper Hand then went to the pickup truck, which was lying on its driver's side in the middle of the road. The driver of the pickup truck, later identified as the Appellant, was moaning and unable to get out of the truck. Emergency responders arrived, extracted the Appellant from the truck, and placed him on a stretcher. At that point, Trooper Hand asked the Appellant for identifying information so he could inform the Appellant's family about the collision. The Appellant said that he did not want Trooper Hand to contact his (the Appellant's) family. According to the officer, the Appellant had "thick tongue type speech" that was slow and "slurred," but the Appellant appeared to understand the officer's questions and was able to tell the officer his address and where he had been coming from at the time of the collision. The emergency responders then transported the Appellant to the Atlanta Medical Center for treatment of his injuries.

While Trooper Hand assisted at the accident scene, he learned that the driver of the Hyundai had died of injuries from the collision. Further, an eyewitness told Trooper Hand that he had seen the Appellant's truck "all over the road" before the vehicles collided head-on in the other driver's lane. Another officer also notified Trooper Hand that, shortly before the collision, someone had called 911 to report that

the driver of a Toyota Tundra pickup truck had driven through the caller's yard, run over a mailbox, and appeared to be impaired.

After leaving the accident site, Trooper Hand drove to the Atlanta Medical Center to conduct a further investigation of the collision. The Appellant was in the emergency department and had already received a CT scan and medications for pain and nausea when Trooper Hand arrived. A registered nurse was also in the Appellant's room. Trooper Hand re-introduced himself and told the Appellant that he was there to investigate the collision and was going to read him the implied consent notice. According to the officer, the Appellant was alert and appeared to understand what was being said, and, when the Appellant asked about the other driver and learned that he had died in the collision, the Appellant "teared up." Then, before the officer read the implied consent notice or questioned the Appellant, the Appellant stated that he had self-administered methadone earlier in the day and that there was possibly some other "stuff" in his system.[3] The officer did not ask any follow-up questions about the Appellant's statement.

---

[3] See Division 4, infra.

Trooper Hand read the Appellant the implied consent notice while the registered nurse was still present in the room.[4] In addition, the officer asked the Appellant to sign an official voluntary consent form authorizing a blood test, and the Appellant signed the form in the officer's presence. Trooper Hand testified that the Appellant did not say anything or display any conduct that indicated that he was unable to consent to the blood test or that his consent was not given freely and voluntarily.[5] After the Appellant signed the consent form, the nurse drew a blood sample from him, and the sample was sent to the Georgia Bureau of Investigation's Division of Forensic Sciences (hereinafter, "state crime lab") to be tested for alcohol and drugs.

According to a forensic toxicologist employed by the state crime lab, the Appellant's blood test results showed that he had methadone and Clonazepam (benzodiazepine) in his system. The toxicologist testified that Clonazepam is a central nervous system depressant that causes sedation, drowsiness, slow movement, mental clouding, and distractability, among other things, and is prescribed to treat anxiety and insomnia. On the other hand, methadone is a narcotic analgesic or pain killer that

[4] See Division 1 (a), infra.

[5] See Division 1 (b), infra.

5

is often used in the treatment of people who are addicted to opioids and other pain medications. The forensic toxicologist testified that methadone also has some central nervous system depressant effects and, when combined with Clonazepam, the sedative effect on a person's brain is exaggerated, although the person could also experience a "euphoria" or a "high that is comparable to heroin" when combining the drugs.

An investigation and accident reconstruction conducted by law enforcement officers revealed that, at 9:52 p.m., the Appellant's pickup truck crossed into the opposite lane of traffic and collided head-on with the Hyundai. Based upon the results of the investigation and the blood test results, the Appellant was arrested and charged with homicide by vehicle, DUI, and failure to maintain a lane.

In addition to the above evidence, the State presented evidence during the Appellant's jury trial that the Appellant had been receiving daily methadone treatment for opiate addiction for several months prior to the collision at issue. The health care provider who treated the Appellant on the day of the collision testified that, at 10:09 a.m., the Appellant ingested 40 milligrams of methadone. She also gave him two 40-milligram doses for him to self-administer during the next two days. According to a physician employed by the methadone clinic, the Appellant never informed the clinic

that he was also taking Clonazepam (benzodiazepine) that had been prescribed by another physician.

Further, the physician who had prescribed Clonazepam for the Appellant in April and May 2014 testified that he always asks his patients if they are taking any other medications, and the Appellant never told him that he was undergoing daily methadone treatment. The physician testified that, if he had known the Appellant was taking methadone daily, he would not have given him a benzodiazepine prescription. The physician explained that clinics that provided methadone treatment explicitly prohibited their patients from taking any other controlled substances with a potential for abuse, such as benzodiazepine. Another reason he did not prescribe benzodiazepine in such situations was because combining a narcotic pain medication, such as methadone, with benzodiazepine could result in "additive or synergistic effects," such as sedation, confusion, and addiction. In addition, the physician testified that he always warns his patients who are taking benzodiazepine that they should not drive after taking the medication because they could be impaired and, as a result, charged with DUI. In fact, for this reason, he specifically changed the Appellant's prescription for Clonazepam so that he was only supposed to take it at night.

Finally, the State presented evidence that the Appellant had previously driven his truck while he appeared to be under the influence of alcohol or drugs,[6] and that, on one of those occasions, he hit a parked car in a shopping center parking lot.[7] The State also showed the jury video-recordings of the Appellant taken by a family member a few hours before the collision in this case; the recordings appeared to show that the Appellant was impaired.[8]

Following the jury's guilty verdicts on all three charges, the trial court sentenced the Appellant to serve 16 years in prison. On appeal from his convictions, the Appellant argues that the trial court improperly admitted several items of evidence that he claims were illegally obtained, irrelevant, and/or unduly prejudicial. He contends that, if such evidence had not been admitted, the remaining evidence would have been insufficient to support the jury's verdict and, as a result, his convictions must be reversed. We disagree.

> On appeal from a criminal conviction, we view the evidence in the
> light most favorable to the verdict and an appellant no longer enjoys the

---

[6] See Division 5 (a), infra.

[7] See Division 5 (b), infra.

[8] See Division 6, infra.

8

presumption of innocence. This Court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*,[9] and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, we must uphold the jury's verdict.[10]

The standard of *Jackson v. Virginia*,[11] is met if the evidence is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime charged.[12]

Further, when the facts that are material to a decision on a motion to suppress are disputed,

it generally is for the trial judge to resolve those disputes and determine the material facts. This principle is well established, and our Supreme Court has identified three corollaries of the principle, which limit the scope of review in appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts. An

---

[9] 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[10] *Walker v. State*, 329 Ga. App. 369, 370 (765 SE2d 599) (2014) (punctuation and footnote omitted).

[11] 443 U. S. at 319 (III).

[12] See *Bautista v. State*, 305 Ga. App. 210, 211 (1) (699 SE2d 392) (2010).

9

appellate court generally must (1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit its consideration of the disputed facts to those expressly found by the trial court. Moreover, an appellate court may also consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. And we review de novo the trial court's application of law to the undisputed facts.[13]

Similarly, when reviewing a trial court's ruling on the admissibility of an incriminating statement by the defendant, we affirm the trial court's finding that the defendant made the statement freely and voluntarily unless such finding is clearly erroneous.[14] And, as to the court's decision to admit other evidence, we generally

---

[13] *State v. Osterloh*, 342 Ga. App. 668, 668-669 (804 SE2d 696) (2017) (punctuation and footnotes omitted). Accord *McKibben*, 340 Ga. App. at 89; see also *Anderson v. State*, 267 Ga. 116, 118-119 (2) (475 SE2d 629) (1996) ("In a motion to suppress, the credibility of the witnesses and the weight to be accorded their testimony rest with the trier of fact, who is under no obligation to believe a witness, even in the absence of contradictory testimony. The fact finder may accept part of a witness' testimony and reject another part[.]") (citation and punctuation omitted).

[14] See *Boyd v. State*, 302 Ga. App. 455, 457 (3) (691 SE2d 325) (2010).

10

review the ruling to determine if it constitutes an abuse of discretion.[15] With these guiding principles in mind, we turn now to the Appellant's specific claims of error.

1. The Appellant contends that the trial court erred in failing to suppress the results of the state-administered blood test, arguing that the results were obtained through an unlawful search and seizure and that he did not knowingly and voluntarily consent to the test.

> A suspect's right under the Fourth Amendment [to the United States Constitution] to be free of unreasonable searches and seizures applies to the compelled withdrawal of blood, and the extraction of blood is a search within the meaning of the Georgia Constitution.[16] In general, searches are of two types: those conducted with a search warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-

---

[15] See *Carter v. State*, 296 Ga. App. 598, 601, n. 7 (675 SE2d 320) (2009).

[16] See Ga. Const. of 1983, Art. 1, Sec. I, Par. XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated[.]"); see also *Williams v. State*, 296 Ga. 817, 818, n. 5 (771 SE2d 373) (2015) (noting that the Supreme Court "has held that Paragraph XIII is applied in accord with the Fourth Amendment in the context of [the] guarantee" against unreasonable searches and seizures) (citation omitted).

delineated exceptions. Thus, a warrantless search is presumed to be invalid, and the State has the burden of showing otherwise.[17]

It is well settled that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."[18] And, "when relying on the consent exception to the warrant requirement, the State has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances."[19]

As shown above, Trooper Hand testified that, not only did he read the applicable implied consent notice[20] to the Appellant before the blood test was performed, he also obtained the Appellant's written consent to the test. The trial court

---

[17] *Williams*, 296 Ga. at 819 (citations omitted).

[18] *State v. Stephens*, 289 Ga. App. 167, 169 (657 SE2d 18) (2008) (punctuation and footnote omitted).

[19] *Williams*, 296 Ga. at 821 (citations and punctuation omitted). Notably, in *Williams*, the Supreme Court cited to appellate opinions from other states that "seem to indicate . . . that mere compliance with statutory implied consent requirements does not, per se, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant." Id. at 822 (citations omitted).

[20] See OCGA § 40-5-67.1 (b) (2) (implied consent notice for suspects age 21 or over).

conducted a hearing on the Appellant's motion to suppress the blood test results and denied the motion. The court found that Trooper Hand had read the implied consent notice to the Appellant; that, while the officer had probable cause to obtain the blood sample, the Appellant was not under arrest or in custody at the time of the test; that there was no evidence that the Appellant was in distress, pain, or shock or that he had any "physical issues" that affected his ability to consent to the blood test; and that the Appellant voluntarily gave written consent to the blood test. In making these findings, the court specifically found that the testimony of Trooper Hand and the registered nurse was credible, consistent, and uncontroverted. Because the Appellant challenges the validity of both the implied consent and his actual written consent, we address each issue in turn.

(a) *Implied consent*. OCGA § 40-5-55 (a) provides, in relevant part, as follows:

[A]ny person who operates a motor vehicle upon the highways or elsewhere throughout this state shall be deemed to have given consent, subject to Code Section 40-6-392,[21] to a chemical test or tests of his or her blood, breath, urine, or other bodily substances for the purpose of

---

[21] OCGA § 40-6-392 delineates the procedural requirements for the admission at trial of the results of a state-administered chemical analysis of a person's bodily substances or the person's refusal to submit to such tests; it also addresses the inferences that may be drawn from such results.

determining the presence of alcohol or any other drug, if arrested for any offense arising out of acts alleged to have been committed in violation of Code Section 40-6-391 or if such person is involved in any traffic accident resulting in serious injuries or fatalities.

The Appellant argues that the State failed to prove that Trooper Hand read him the implied consent notice because the officer did not record in his police report that he had given the notice. During the motion to suppress hearing, however, Trooper Hand testified that it was his standard practice and procedure to read the implied consent notice to individuals suspected of DUI prior to obtaining a blood sample. He testified that he read the required notice to the Appellant, but he acknowledged that he had accidentally failed to document in his internal report to the supervising investigator that he had read the notice. Trooper Hand further explained that he specifically remembered the details of this case because of its "magnitude" and because he had grown up near the collision site and passed it every day on his way to work.

Further, the nurse who obtained the Appellant's blood sample testified that she was in the room with the Appellant when the officer arrived and that, as a matter of her standard practices and procedures, she never drew a patient's blood for law

14

enforcement purposes unless she had personally observed the requesting officer read the implied consent notice to the patient.

Viewing the evidence in favor of the trial court's ruling,[22] we find no error in its conclusion that Trooper Hand read the Appellant the necessary implied consent notice before the blood sample was obtained. Moreover, even if Trooper Hand had, in fact, failed to read the implied consent notice, the Appellant's voluntary written consent[23] to the blood test eliminated the need for the officer to read the notice.[24] Thus, this alleged error lacks merit.

---

[22] See *McKibben*, 340 Ga. App. at 89-90.

[23] See Division 1 (b), infra.

[24] See OCGA § 40-5-67.1 (d.1) ("Nothing in this Code section shall be deemed to preclude the acquisition or admission of evidence of a violation of Code Section 40-6-391 if obtained by voluntary consent[.]"); *McMullen v. State*, 316 Ga. App. 684, 693-694 (3) (a) (730 SE2d 151) (2012) (ruling that the 2006 amendment to OCGA § 40-5-67.1 adding subsection (d.1) "eliminates the need to give the [implied consent] notice when an individual voluntarily agrees to testing.") (punctuation and footnote omitted).
    We note that the Appellant errs in relying on *State v. Morgan*, 289 Ga. App. 706, 707 (658 SE2d 237) (2008), for his argument that "an officer *must* read a suspect his implied consent rights before the suspect may be subjected to a state-administered blood test, 'even though a suspect may otherwise consent to testing.'" (Emphasis in original.) This Court has specifically noted that *Morgan* was decided under the prior version of OCGA § 40-5-67.1 that did not include subsection (d.1), and it has implicitly ruled that *Morgan* no longer constitutes precedent on this issue. See *McMullen*, 316 Ga. App. at 693 (3) (a), n. 42.

15

(b) *Actual written consent*. As shown above, in addition to reading the implied consent notice, Trooper Hand also obtained the Appellant's actual written consent to the blood test. The Appellant argues that he did not give his actual consent knowingly or voluntarily because, at the time he signed the form, he was under the influence of pain medication administered to him in the emergency room, was in pain and in shock from his injuries,[25] and was upset upon learning of the other driver's death.

As stated above, the determination of whether the Appellant knowingly and voluntarily gave actual consent to the blood test depends on consideration of the totality of the circumstances presented.[26]

> A consent to search will normally be held voluntary if the totality of the
> circumstances fails to show that the officers used fear, intimidation,
> threat of physical punishment, or lengthy detention to obtain the
> consent. The trial court may also consider as factors in its analysis
> prolonged questioning, the accused's age, level of education,
> intelligence, and advisement of constitutional rights; and the
> psychological impact of these factors on the accused. Moreover, while

---

[25] Although the Appellant's brief states that he received "a serious head injury and hip injury during the collision," the only evidence presented regarding his injuries was Trooper Hand's hearsay testimony that unidentified hospital personnel had told him that the Appellant had some type of "head injury" and another, unspecified injury.

[26] See *Williams*, 296 Ga. at 819.

knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. Instead, the court should consider whether a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter.[27]

In this case, the undisputed evidence shows that the Appellant had methadone and Clonazepam in his system at the time of the collision. In addition, during the almost three hours between the collision and the Appellant's signing of the consent form, the Appellant was transferred to Atlanta Medical Center and received an "x-ray and/or CT scan" and other tests, as well as medication, in the emergency room. Even so, the emergency room's medical records show that the Appellant was "oriented" and "obey[ed] commands" when he was examined at approximately 11:00 p.m. and when he was checked again five, thirty, and sixty minutes later.

Trooper Hand testified that, when he spoke with the Appellant in the emergency room, the Appellant was alert and appeared to understand what was going on; the Appellant responded appropriately to questions; the Appellant asked him questions about the collision and the condition of the other driver; he (Trooper Hand)

---

[27] *Steele v. State*, 337 Ga. App. 562, 564 (2) (788 SE2d 145) (2016) (citations and punctuation omitted). Accord *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016).

17

told the Appellant that the blood test was voluntary and did not threaten the Appellant or promise him anything in exchange for his written consent; and there was nothing that suggested to Trooper Hand that the Appellant was not able to consent or was not freely and voluntarily giving his consent to the blood test.

Moreover, the nurse who obtained the Appellant's blood sample testified about the medications the Appellant received in the emergency room and their effects on a patient's system. The medical records showed that, at 11:17 p.m., he received Zofran for nausea and Fentanyl for pain, and that, at 11:35 p.m., he received a combination of succinylcholine ("SUX") and Propofol, which sedates and temporarily paralyzes the patient. According to the nurse, the SUX/Propofol combination was typically used to relax a patient's muscles in order to reposition a dislocated joint, and, based upon the amount given to the Appellant, the drugs' effects would last for only five to seven minutes. The nurse also testified that the hospital only gave enough Fentanyl to the Appellant to take "the edge off" the pain, and opined that most people would be "totally lucid" a few minutes after receiving the drugs in the amounts given to the Appellant. It is undisputed that Trooper Hand obtained the Appellant's written consent to the blood test at 12:38 a.m., over an hour after the hospital gave the Appellant the medications at issue.

Finally, the forensic toxicologist from the state crime lab testified that only two drugs were found in the Appellant's blood sample: methadone and Clonazepam (benzodiazepine).[28] Thus, the medications administered in the emergency room were no longer detectable in the Appellant's blood at the time the blood sample was obtained, which was after he signed the written consent form.

Given this evidence, we find no error in the trial court's conclusion that, under the totality of the circumstances, the Appellant freely and voluntarily consented to the blood test.[29]

---

[28] We note that a person cannot defend against a charge of homicide by vehicle by driving under the influence of drugs by showing that he was prescribed the drugs at issue or is otherwise legally entitled to use the drugs if those drugs rendered him incapable of driving safely. See *McMullen*, 316 Ga. App. at 689 (1). Further, even if a suspect appears to be visibly intoxicated, that does not automatically render his or her consent involuntary. See *Jacobs v. State*, 338 Ga. App. 743, 748-749 (2) (791 SE2d 844) (2016).

[29] See *State v. Reid*, 337 Ga. App. 77, 78 (786 SE2d 694) (2016) (reversing the trial court's order suppressing blood test results after concluding that the defendant's consent to a blood test was free and voluntary when she verbally agreed to the blood test and signed a written consent form; evidence showed that she understood the situation and was able to converse with the officer; and there was no evidence of any coercive circumstances that rendered her consent involuntary); cf. *Osterloh*, 342 Ga. App. at 672-674 (affirming the trial court's suppression of blood test results when evidence showed that the defendant sustained such a serious head injury in the collision that he had to be placed in a medically induced coma in the intensive care unit for three days, and that, while an officer read him the implied consent notice at the scene of the collision, he was handcuffed and held on the ground by deputies, and

2. The Appellant claims that there was no probable cause to suspect that he was driving under the influence of drugs or alcohol at the time of the collision and, because he was not under arrest, Trooper Hand was not authorized to request the blood test.

"[W]here an individual has been involved in a traffic accident resulting in serious injuries or fatalities [(as in the instant case)] *and* the investigating law enforcement officer has probable cause to believe that the individual was driving under the influence of alcohol or other drugs, . . . the ensuing search is both warranted and constitutional[,]" regardless if the individual is under arrest at the time the implied consent notice is given under OCGA § 40-5-55 (a).[30]

---

was "babbling, retching, and yelling"); *Stephens*, 289 Ga. App. at 167-168 (affirming the trial court's suppression of blood and urine test results when evidence showed the following: after the defendant was involved in a fatal collision, a state trooper found him on the ground in a fetal position, rocking back and forth, crying, and mumbling to himself; at the hospital, when the trooper began reading a written consent form to the defendant, who could not read, the defendant became incoherent and violent and had to be restrained; and the defendant's wife signed the consent form on the defendant's behalf, but there was no evidence that the defendant understood the form).

[30] *Hough v. State*, 279 Ga. 711, 713 (1) (a) (620 SE2d 380) (2005) (emphasis in original). See OCGA § 40-5-55 (a) ("[A]ny person who operates a motor vehicle upon the highways or elsewhere throughout this state shall be deemed to have given consent, subject to Code Section 40-6-392, to a chemical test or tests of his or her blood, breath, urine, or other bodily substances for the purpose of determining the

The test of probable cause requires merely a probability -- less than a certainty but more than a mere suspicion or possibility. To authorize an arrest for DUI, an officer need only have knowledge or reasonably trustworthy information that the suspect was actually in physical control of a moving vehicle, while under the influence to a degree which renders him incapable of driving safely.[31]

Pretermitting whether probable cause was necessary in this case, given the Appellant's actual written consent to the blood test,[32] the record shows that, at the time of the Appellant's collision, Trooper Hand had been a law enforcement officer for about fifteen years, which included four years as a member of the Georgia State Patrol's "Night Hawks DUI Task Force," a specialized unit focused on impaired driving. In that capacity, Trooper Hand participated in over 400 traffic stops based

---

presence of alcohol or any other drug, if arrested for any offense arising out of acts alleged to have been committed in violation of Code Section 40-6-391 or if such person is involved in any traffic accident resulting in serious injuries or fatalities.").

[31] *Castaneda v. State*, 292 Ga. App. 390, 394 (1) (664 SE2d 803) (2008) (punctuation and footnotes omitted).

[32] See Division 1 (b), supra; see also *Williams*, 296 Ga. at 821 ("[I]t is well settled in the context of a DUI blood draw that a valid consent to a search eliminates the need for either probable cause or a search warrant.") (citations omitted); *Osterloh*, 342 Ga. App. at 671.

on suspicion of impaired driving and was involved in numerous investigations of vehicular homicide.

During the hearing on the motion to suppress, Trooper Hand testified that the Appellant's speech was "thick" and "slurred" after the emergency personnel removed him from the truck and placed him on the stretcher. In addition, Trooper Hand testified about the eyewitness' statement that the Appellant's truck was "all over the road" before it collided head-on with the Hyundai, as well as the information he received about a 911 call earlier that evening reporting that a possibly impaired person driving a Toyota Tundra pickup truck drove onto someone else's property and over a mailbox. And, finally, Trooper Hand testified about the Appellant's unprompted admission that he had self-administered methadone earlier that day and that there might be other drugs in his system.

Under these circumstances, we conclude that the trial court was authorized to find that there was sufficient probable cause to support Trooper Hand's request for a blood test to check for alcohol, drugs, or both.[33]

---

[33] See *Castaneda*, 292 Ga. App. at 390-391, 393-394 (1) (The evidence showed that the arresting officer had significant experience in recognizing impaired drivers; the defendant failed to maintain control over his vehicle while driving and, as a result, drove over a curb and onto a sidewalk, knocked down a mailbox, hit another vehicle, and drove onto an open field; and, at the scene, the defendant was stumbling, his

22

3. In a related claim of error, the Appellant argues that the court erred in admitting his blood test results because Trooper Hand did not read him his *Miranda*[34] rights prior to administering the test. However, it is undisputed that the Appellant was not in police custody or under arrest at the time of the blood test, so he was not entitled to the protections provided by *Miranda*.[35] Further, there is no duty for an officer to inform a suspect of his or her constitutional right against unreasonable searches before obtaining a blood sample.[36] Thus, there was no error.

---

speech was slurred, he was confused, and he had difficulty balancing. Given this evidence, the trial court properly concluded that the officer had probable cause to arrest the defendant for driving under the influence.).

[34] See *Miranda v. Arizona*, 384 U. S. 436, 478-479 (III) (86 SCt 1602, 16 LE3d 694) (1966).

[35] See *Jacobs*, 338 Ga. App. at 745 (1) ("Law enforcement officers are required to give *Miranda* warnings prior to questioning only where the subject is in police custody, having either been formally arrested or restrained to an extent associated with such an arrest. Where one has not been arrested, he will be considered to be in custody only under circumstances where a reasonable person in the same situation would perceive that he was deprived of his freedom of action in a meaningful way.") (citation and punctuation omitted); see also Division 4 (b), infra.

[36] See *Jacobs*, 338 Ga. App. at 748 (2); see also *Olevik v. State*, 2017 Ga. LEXIS 898, *40 (3) (a) (i), n. 13 (___ SE2d ___) (2017) (The Supreme Court expressly declined to impose a "*Miranda*-style prophylactic rule" to protect a DUI suspect's due process rights before officers obtain a sample of the suspect's breath or other bodily substances.).

23

4. The Appellant contends that the trial court abused its discretion in admitting his statement to Trooper Hand that he had self-administered methadone that day and that there could be other "stuff" in his system.

The record shows that the Appellant filed a pretrial motion to exclude the statement, and the trial court conducted a *Jackson-Denno*[37] hearing.

> In deciding the admissibility of a statement during a *Jackson-Denno* hearing, the trial court must consider the totality of the circumstances. The State has the burden to prove the voluntariness of a confession by a preponderance of the evidence. After the trial court determines that the State has met its burden of demonstrating that a defendant's statement was freely and voluntarily given in compliance with *Jackson v. Denno*, it may permit the statement to come into evidence.[38]

Upon review of a trial court's decision to admit a defendant's incriminating statement following a *Jackson-Denno* hearing, this Court will not disturb the trial court's factual findings and credibility determinations unless they are clearly erroneous.[39]

---

[37] See *Jackson v. Denno*, 378 U. S. 368, 394-395 (IV) (84 SCt 1774, 12 LE2d 908) (1964).

[38] *Steele*, 337 Ga. App. at 563 (1) (citations and punctuation omitted).

[39] See id.; accord *Daniel v. State*, 268 Ga. 9, 9-10 (2) (485 SE2d 734) (1997).

24

In this case, the trial court ruled that the Appellant's statement was admissible, finding that the Appellant was not in police custody or under arrest when he made the statement and a reasonable person under the same circumstances would not have believed that he or she was in custody. Further, the court found that the statement was not the result of a police interrogation and that, based upon the evidence presented about the medication given to the Appellant and his ability to understand what was happening at the time, the Appellant made the statement freely and voluntarily.

On appeal from that ruling, the Appellant argues that the State failed to prove (a) that he made the statement freely and voluntarily and (b) that he had been advised of his *Miranda* rights before he made the statement.

(a) The Appellant claims that he did not make the statement voluntarily because he was in pain and under the influence of medications when he made the statement. For the same reasons given in Division 1 (b), supra, we find no error.[40]

---

[40] See *Daniel*, 268 Ga. at 9-10 (2) (In arguing that the trial court erred in admitting an incriminating statement he had made, the defendant argued that, at the time he made the statement, he had been confused and his judgment had been impaired because the victim had hit him the day before. The Court held that, in ruling that the defendant had freely and voluntarily made the incriminating statement, the trial court was authorized to base its ruling solely on the testimony and credibility of the officer who testified at the *Jackson-Denno* hearing.); *Philmore v. State*, 263 Ga. 67, 68 (2) (428 SE2d 329) (1993) (The Court ruled that the trial court did not clearly err in finding that the defendant gave a voluntary statement and made a knowing and

25

(b) The Appellant argues that the statement was not admissible because Trooper Hand failed to read him his *Miranda* rights before the statement was made.

> *Miranda* warnings must be administered when two factors are met: the accused is in custody, and is subjected to interrogation or its functional equivalent. Interrogation, for *Miranda* purposes, occurs when there is express questioning and words and actions that officers should know are reasonably likely to elicit an incriminating response from the subject.[41]

"The Fifth Amendment requires the exclusion of any statement made by an accused during custodial interrogation, unless he has been advised of his [*Miranda*] rights and

---

involuntary waiver of his *Miranda* rights, even though the defendant had used crack cocaine and may have still been under the drug's effect during the custodial interview, because the interviewing officer testified that the defendant did not appear to be under the influence of drugs, had no difficulty speaking and responding to questions, and had not been threatened or coerced.); cf. *Mincey v. Arizona*, 437 U. S. 385, 396-402 (II) (98 SCt 2408, 57 LE2d 290) (1978) (The defendant, a murder suspect, was in a hospital's intensive care unit with a serious gunshot wound to his hip. He was on medication, intubated to assist in breathing, and being fed intravenously; he was also almost comatose, in severe pain, confused, somewhat incoherent, and unable to speak. Still, after giving the defendant *Miranda* warnings, an officer interrogated him, with the defendant responding in writing. Although the defendant repeatedly asked to speak to a lawyer, the interrogation continued. The Court concluded that, under these circumstances, the defendant's statements were involuntary, so the statements were inadmissible in both the State's case-in-chief and for impeachment purposes.).

[41] *Johnson v. State*, 301 Ga. 707, 711 (III) (804 SE2d 38) (2017) (citations and punctuation omitted).

has voluntarily waived those rights. [However, a] defendant's spontaneous, voluntary, unprompted utterance to a police officer is admissible against him at trial."[42]

Here, the evidence supports the trial court's findings that, at the time of the statement, the Appellant was not under arrest or in police custody and that the statement was not the result of police interrogation.[43] The evidence also shows that, after the Appellant spontaneously made the statement to Trooper Hand, the officer did not attempt to elicit any further incriminating statements.[44] Under these circumstances, the trial court did not err in finding that the statement was admissible even though it was not preceded by a *Miranda* warning.[45]

---

[42] *Haggins v. State*, 277 Ga. App. 742, 745 (2) (a) (627 SE2d 448) (2006) (punctuation and footnotes omitted). See *Johnson*, 301 Ga. at 711 (III) ("[A] spontaneous and unsolicited statement is admissible without *Miranda* warnings if it was not elicited by questioning or made in response to any form of custodial interrogation.") (citation omitted).

[43] See *Steele*, 337 Ga. App. at 563 (1).

[44] See generally *Boyd*, 302 Ga. App. at 457 (3) (During a *Jackson-Denno* hearing concerning the admissibility of an incriminating comment by the defendant, the deputy who heard the comment testified, and the defendant offered no evidence to rebut the deputy's testimony. Because the trial court clearly found the deputy's testimony to be credible, it did not err in finding that the defendant's statement was admissible as an unsolicited comment that was not made as a result of police interrogation.).

[45] See *Johnson*, 301 Ga. at 711 (III); *Haggins*, 277 Ga. App. at 745 (2) (a).

5. The Appellant contends that the trial court abused its discretion in admitting evidence of conduct that he committed prior to May 24, 2014, the date of the collision at issue, arguing that the evidence was irrelevant, unduly prejudicial, and inadmissible under OCGA § 24-4-404. OCGA § 24-4-404 (b) provides, in relevant part, as follows:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[46]

In order for evidence of other acts to be admissible under this provision, the State must make the following showings:

> (1) evidence of extrinsic, or other, acts is relevant to an issue other than a defendant's character . . . [[47]]; (2) the probative value of the other acts

---

[46] At trial, the court gave a limiting instruction before each witness who testified about the Appellant's prior acts.

[47] See OCGA § 24-4-401 ("[T]he term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); see also *State v. Jones*, 297 Ga. 156, 159 (2) (773 SE2d 170) (2015) (OCGA § 24-4-404 (b) "explicitly recognizes the relevance of other acts evidence offered for a permissible purpose" and is therefore "an evidentiary rule of inclusion which contains a non-exhaustive list of purposes other than bad character for which

evidence is not substantially outweighed by its unfair prejudice, i.e., the evidence must satisfy the requirements of [OCGA § 24-4-403[48]]; and (3) there is sufficient proof so that the jury could find that the defendant committed the act in question.[49]

While the determination of whether evidence is unduly prejudicial "is a matter committed principally to the discretion of the trial courts," the Supreme Court of Georgia has emphasized that "the exclusion of evidence under [OCGA § 24-4-403] is an extraordinary remedy [that] should be used only sparingly."[50] Ultimately, "[a] trial court's decision to admit other acts evidence will be overturned only where there is a clear abuse of discretion."[51]

---

other acts evidence is deemed relevant and may be properly offered into evidence.") (citations omitted).

[48] OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[49] *Jones*, 297 Ga. at 158-159 (1) (citations omitted).

[50] *Olds v. State*, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016) (citation and punctuation omitted). See also *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016) ("The major function of [OCGA § 24-4-403] is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.") (citation and punctuation omitted).

[51] *Jones*, 297 Ga. at 159 (1) (citations omitted).

In this case, the State offered evidence of the Appellant's prior acts to show his intent, his knowledge, and the absence of mistake or accident, i.e., to show that he had intentionally driven while knowing that he was impaired after taking methadone.[52] The court admitted the evidence, ruling that it was relevant to the purposes for which it was offered, there was a sufficient connection between the Appellant's previous conduct and the conduct at issue in this case, and the probative value of the evidence was not outweighed by unfair prejudice.

(a) The Appellant argues that the trial court abused its discretion in admitting evidence that his wife called 911 over three months before the collision at issue to report that he might be driving under the influence.

The record shows that, at 8:06 a.m. on February 9, 2014, the Appellant ingested a 55-milligram dose of methadone at a methadone clinic; he also received a take-home dose of 55 milligrams to self-administer the next day. Later that morning, the Appellant left his home in his truck, and his wife was concerned that he was too

---

[52] See *Jones*, 297 Ga. at 162 (2) ("The relevancy of evidence of a prior state of mind[,] and the introduction of evidence of repetitive conduct to allow a jury to draw logical inferences about a defendant's knowledge and state of mind from such conduct[,] is well-established.") (citations and footnote omitted).

We note that the Appellant's counsel affirmatively waived any objection to evidence that the Appellant had used methadone on the dates he committed the prior acts.

impaired to drive safely. At 12:34 p.m., the Appellant's wife called 911 and asked the operator to issue a "be on the lookout" ("BOLO") alert so police officers would pull him over if they saw his truck "and see what they thought" about whether it was safe for him to drive. The Appellant's wife initially told the operator that the Appellant is "seriously seriously mentally impaired right now. I don't know if he's on something." However, she later told the operator that "he's on something. He didn't smell like alcohol."[53] She also told the operator that the Appellant "is very very uncoherent [sic]. He does not need to be driving." She said that the Appellant was driving a 2010 white Toyota Tundra pickup truck and that he had "busted out" the back right taillight the day before. In addition, the Appellant's wife told the operator that she had previously called 911 to get a BOLO alert issued under similar circumstances and that she was concerned that the Appellant might injure "some poor helpless family" if police officers did not pull him over soon.

Under these circumstances, we find no error in the trial court's determination that this evidence was relevant to the Appellant's knowledge and intent to drive while

---

[53] See generally *New v. State*, 171 Ga. App. 392 (5) (319 SE2d 542) (1984) ("[A] witness who satisfactorily shows that he had opportunity to observe, and did observe, the condition of another, may testify whether that person was under the influence of intoxicants and the extent thereof, stating the facts upon which the opinion is based.") (citations and punctuation omitted).

under the influence of methadone, that there was a sufficient connection between the acts, and that the probative value of the evidence outweighed its prejudicial impact.[54]

(b) The Appellant argues that the trial court abused its discretion in admitting evidence that, approximately three months before the collision at issue, he hit a parked car with his truck after he had taken a dose of methadone earlier in the day.

The record shows that, at 10:57 a.m. on February 19, 2014, the Appellant was administered a 50-milligram dose of methadone at a methadone clinic. Later that day, a woman walking in a shopping center saw a white pickup truck moving slowly and swerving through the parking lot, with the driver "kind of slumped over."[55] The truck

---

[54] See *Jones*, 297 Ga. at 162-163 (2) (The trial court did not abuse its discretion in admitting evidence of the defendant's prior DUI conviction as it was relevant for the limited purpose of establishing the defendant's intent and knowledge in committing the charged crimes of DUI; in other words, the prior conviction "had a tendency to make the existence of [the defendant's] general intent to drive under the influence more probable and would authorize a jury to logically infer that [the defendant] was voluntarily driving while under the influence.") (citation omitted); *Monroe v. State*, 340 Ga. App. 373, 375 (2) (797 SE2d 245) (2017); see also *King v. State*, 338 Ga. App. 783, 787 (792 SE2d 414) (2016) (Because the defendant's defense to a DUI charge was that he had not driven while intoxicated, but only drank after stopping, the trial court did not err in finding that the evidence that he had previously driven while intoxicated was exceptionally relevant and probative of his intent to drive while intoxicated, so that any prejudicial impact did not outweigh its probative value.).

[55] See *McKay v. State*, 264 Ga. App. 726, 729 (2) (592 SE2d 135) (2003) (After the defendant hit a pedestrian with his truck, an eyewitness observed that he was

32

hit a concrete barrier before colliding with a parked car. The driver got out of the truck and ran into a store, then ran back to his truck, got in, and drove away. The eyewitness testified that the driver had difficulty as he was leaving in the truck, noting that the truck was bumping into things and that it hit the parked car again on the way out. The eyewitness called 911 while another witness attempted to get the truck's license plate number.

A Coweta County Sheriff's deputy responded to the 911 call and, based upon information obtained from the eyewitnesses, was able to locate the pickup truck at the Appellant's home. At the time the deputy arrived, the Appellant was applying "bondo" putty on the truck to repair what appeared to be "fresh damage" to the front of the vehicle. The deputy asked the Appellant what had caused the damage to the truck, and the Appellant started to respond. The deputy stopped him, however, and told the Appellant that he already knew what had happened to the truck. Observing that the Appellant appeared to be under the influence of something, the deputy asked

unable to move his truck from its parking space without difficulty and that he was slumped over the steering wheel of his truck, smelled of alcohol, and was incoherent. When bystanders blocked his truck to prevent him from leaving, the defendant fled on foot. The Court ruled that the eyewitness' testimony about the defendant's intoxication was admissible and that a rational trier of fact could conclude from this evidence that the defendant was driving under the influence of alcohol.).

the Appellant what he had taken, but the Appellant denied that he had used any drugs or alcohol. The deputy arrested the Appellant, and the Appellant pled guilty to striking an unattended vehicle.

As with the 911 call by the Appellant's wife,[56] this evidence is relevant to whether the Appellant intentionally drove his truck while under the influence of methadone. We find no error in the trial court's ruling that this evidence was admissible under OCGA § 24-4-404 (b).[57]

6. The Appellant contends that the trial court abused its discretion in admitting four video-recordings taken at his home by his mother-in-law on the evening of the collision at issue. He argues that the recordings were inadmissible under the "best evidence" rule[58] and that the State failed to rebut his challenge to the authenticity of the recordings.

---

[56] See Division 5 (a), supra.

[57] See *Jones*, 297 Ga. at 162-163 (2); *King*, 338 Ga. App. at 787.

[58] See OCGA §§ 24-10-1002 ("To prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph shall be required."); 24-10-1003 ("A duplicate shall be admissible to the same extent as an original unless: (1) A genuine question is raised as to the authenticity of the original; or (2) A circumstance exists where it would be unfair to admit the duplicate in lieu of the original."); see also OCGA § 24-10-1001 (1), (3), (4) (definitions).

The evidence showed that, at 10:09 a.m. on the day of the collision, the Appellant received a 40-milligram dose of methadone; he was also given two 40-milligram doses to self-administer during the next two days. According to the Appellant's mother-in-law, who lived with the Appellant and his family, she saw the Appellant trying to back his truck down the driveway at approximately 6:00 p.m. that evening. The Appellant was having difficulty maneuvering the truck and, when he exited the truck and sat down, he appeared to be sick. The mother-in-law made a short video-recording of him with her phone,[59] then called her daughter (the Appellant's wife), telling her to come home because the Appellant was sick. At 7:23 p.m., the Appellant and his wife started arguing,[60] and the mother-in-law video-recorded the exchange because she thought the Appellant was being "aggressive" with his wife. Shortly thereafter, at 8:50 p.m., the Appellant and his wife continued their argument, and the Appellant started yelling; the mother-in-law again video-recorded the incident. Finally, at 8:54 p.m., the mother-in-law recorded the Appellant as he discussed the next workday with her. The mother-in-law testified that, at the end of

---

[59] The State played all of the video-recordings for the jury.

[60] According to the Appellant's wife, they were arguing because he wanted to drive her son to see a movie, and she would not let him because she believed he was impaired.

their conversation, the Appellant ran into a bookcase as he left the room, and she was concerned that he was impaired. Less than an hour later, the Appellant was involved in the collision at issue.

The trial court denied the motion to exclude the recordings, ruling that, as long as the State presented evidence to provide a foundation for the recordings, the Appellant's objections went to the weight, not the admissibility, of the video-recordings. At trial, the Appellant's wife and his mother-in-law provided the foundation for admitting the recordings when they both testified that the mother-in-law recorded the videos with her phone on the night of the collision, May 24, 2014.

Pretermitting whether the Appellant raised a "best evidence" objection in the trial court[61] or whether the State adequately established the authenticity of the recordings, we find that the evidence was merely cumulative of other competent evidence showing that the Appellant appeared to be impaired shortly before the

---

[61] See *West v. State*, 300 Ga. App. 583, 585 (2) (685 SE2d 486) (2009) ("Issues and objections not raised in the trial court and ruled on by the trial court are deemed waived and cannot be raised for the first time on appeal.") (footnote omitted); see also *Warren v. State*, 289 Ga. App. 481, 485 (4) (a) (657 SE2d 533) (2008) (After evidence has been admitted, over objection, on the condition that the State establish a foundation for it, the defendant's failure to renew his objection after the foundation has been established waives appellate review of the objection.).

collision.[62] Moreover, as shown above, there was overwhelming admissible evidence to show that the Appellant was impaired by drugs to the extent that it was less safe for him to drive on the night of the collision. Consequently, we conclude that any error was harmless beyond a reasonable doubt and does not require reversal of the Appellant's convictions.[63]

*Judgment affirmed. Miller, P. J., and Doyle, P. J., concur.*

---

[62] Such evidence includes, inter alia, a neighbor's testimony that the Appellant had driven onto the neighbor's property and over his mailbox shortly before the collision and that the Appellant was crying and "jittery" at that time.

[63] See *Belmar v. State*, 279 Ga. 795, 800 (3) (621 SE2d 441) (2005) (Even if the trial court erred in admitting certain evidence, "[r]eversal is not required if the evidence of guilt is so overwhelming that there is no reasonable probability that the verdict of the jury would have been different in the absence of this error.") (citation and punctuation omitted); see also *Williams v. State*, 301 Ga. 829, 832 (2) (804 SE2d 398) (2017) (The improper admission of evidence regarding a separate incident from the offense at issue was harmless when it was cumulative of other competent evidence and the evidence that the defendant committed the crime charged was overwhelming.); *Billings v. State*, 293 Ga. 99, 103 (3) (745 SE2d 583) (2013).