**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 19, 2018**

# In the Court of Appeals of Georgia

A18A1051. MARTINEZ v. THE STATE.

MILLER, Presiding Judge.

Juan Martinez was charged with numerous counts of sexual exploitation of a child (OCGA § 16-12-100 (b) (8)), and he moved to suppress the cell phone images underlying the charges. After the trial court denied the motion to suppress, Martinez proceeded to a bench trial in which he stipulated to the facts as alleged in the indictment and preserved his right to appeal from the denial of his motion to suppress. On appeal, Martinez challenges the denial of his motion to suppress the cell phone images on the grounds that the search of his cell phone violated his Fourth Amendment rights. At this juncture, we do not address the validity of Martinez's convictions; our review is limited to the trial court's denial of Martinez's motion to suppress. We conclude that the trial court properly found that Martinez gave consent

for police to conduct the initial search of his phone, leading to the discovery of an image of child pornography, but that the trial court's order fails to make any factual findings regarding the scope of Martinez's consent. As this issue was raised and argued before the trial court, we vacate the trial court's order and remand for further factual findings.

> There are three fundamental principles which must be followed when conducting an appellate review of a trial court's ruling on a motion to suppress. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. These principles apply equally whether the trial court ruled in favor of the State or the defendant.

(Citations, punctuation, and emphasis omitted.) *Phillips v. State*, 338 Ga. App. 231 (789 SE2d 421) (2016); see also *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015).

So viewed, the evidence presented at the suppression hearing shows that at about 10:40 p.m. on April 13, 2016, officers from the Hall County Sheriff's Office and the U. S. Marshal's Office, and agents from the Georgia Bureau of Investigation (GBI) were checking on registered sex offenders to verify their compliance with the registration requirements. The group, which included about five or six people, went to Martinez's listed address to verify his information. Three officers went onto the front porch and knocked on the door, while the remaining officers set up a perimeter to ensure everyone's safety and to prevent anyone from trying to flee. The officers were all dressed in uniforms identifying the specific agency to which they were assigned, and all were armed.

Martinez's mother answered the door and then called for Martinez to come out. Martinez came outside and sat down on the porch with the officers. After confirming that the registry information was correct, a Hall County Sheriff's officer asked Martinez if he had any electronic devices. Martinez responded that he had a phone and asked his mother to get it. A female GBI agent asked if she could inspect the phone, and Martinez handed it to her.[1] After a short conversation, the agent returned

[1] The GBI agent did not testify at the suppression hearing, and neither of the two officers who did testify could remember the exact words the GBI agent said when asking for consent to look at the phone. There is no video or audio recording of the

the phone to Martinez, and the two spoke about applications on the phone, including music, Facebook, and YouTube. Martinez began to show the agent something on the phone and then he again voluntarily handed the phone to her. At this point, the agent observed an image she believed to depict child pornography. Without any further conversation with Martinez, the agent then carried the phone to another agent who specialized in forensic technology. Using his equipment, the technologist conducted another search, which lasted, according to Martinez, about 30 minutes, and found more than 1,000 potential pornographic images on Martinez's phone.

After discovering the images on the phone, the officers asked Martinez if they could search his room, and he consented. Martinez was cooperative throughout the encounter, but he did not sign any written consent forms in connection with the agent's search of his phone.

Martinez, his sister, and his mother all testified that officers entered the house before viewing any images on the phone. Martinez stated that he did not consent to any search of his phone; he asked the agent why she wanted to see it, but she did not respond; and that he was afraid to ask again because he feared he would be shot. He denied handing the phone to the agent, instead saying that she took it from his hand.

conversation on the porch.

4

Nevertheless, he admitted accessing the phone for the agent. Additionally, Martinez's mother and sister testified that Martinez had learning difficulties and was easily confused. However, the agent who interviewed Martinez after his arrest testified that Martinez seemed to understand everything and did not seem confused.

Based on the images found on the phone, Martinez was charged with ten counts of sexual exploitation of a child. In an interview with police, Martinez admitted the images on the phone were his.

Martinez moved to suppress the images discovered on his phone, arguing that (1) the agents and officers violated his Fourth Amendment rights by conducting a warrantless search; (2) the agents' conduct exceeded the scope of any permissible visit; (3) the agents and officers entered onto his porch illegally and therefore tainted any alleged consent; (4) any consent was not voluntarily given; and (5) the search exceeded the scope of his consent.

The trial court denied the motion to suppress, finding that the agents were properly at Martinez's home to conduct a sex offender registry check and thus their presence did not violate the Fourth Amendment, and that Martinez freely and voluntarily gave consent to the search of his phone. The trial court did not explicitly address Martinez's argument regarding the scope of the search, nor did it make any

5

factual findings in this regard. Thereafter, Martinez stipulated to the facts charged in the indictment and was convicted of all ten counts. He now appeals.

In related enumerations of error, Martinez argues that the trial court erred in denying his motion to suppress because (1) the search was tainted by the purported illegal entry into his home; (2) any consent was not given freely and voluntarily; and (3) the search exceeded the scope of any consent. Although we agree with the trial court that the officers were lawfully present at Martinez's home and that Martinez voluntarily consented to the initial search of his phone, we conclude that the trial court's order is lacking the factual findings necessary for this Court to address whether the second search using forensic technology exceeded the scope of Martinez's consent.

The Fourth Amendment guarantees individuals the right to be free of unreasonable searches and seizures. U. S. Const. Amend. IV; Ga. Const. of 1983, Art. I, Sec. I, Par. XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated [.]"). In general, searches are of two types: those conducted with a search warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically

established and well-delineated exceptions." (Citation and footnote omitted.) *Diaz v. State*, 344 Ga. App. 291, 297 (1) (810 SE2d 566) (2018).

It is well-settled that consent is one of the exceptions to the warrant requirements. *Diaz*, supra, 344 Ga. App. at 297 (1). And, "when relying on the consent exception to the warrant requirement, the State has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances." (Citation and footnote omitted.) Id.

> A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent. The trial court may also consider as factors in its analysis prolonged questioning, the accused's age, level of education, intelligence, and advisement of constitutional rights; and the psychological impact of these factors on the accused. . . . [T]he court should consider whether a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter.

(Citation and footnote omitted.) *Diaz*, supra, 344 Ga. App. at 299-300 (1) (b).

Nevertheless, "[t]he intrusiveness of a consensual search — including the type, duration, and physical zone of the intrusion — is limited by the permission granted, and only that which is reasonably understood from the consent may be undertaken."

7

(Footnote omitted.) *Walker v. State*, 299 Ga. App. 788, 791 (2) (683 SE2d 867) (2009). As in any type of search, the "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (Citations omitted.) *Riley v. California*, 573 U. S. __ (II) (134 S. Ct. 2473, 2482 (II), 189 LE2d 430) (2014). With this framework in mind, we turn to Martinez's arguments on appeal.

*A. Whether the officers were lawfully in the home's curtilage.*

We first consider Martinez's claim that the officers exceeded the scope of any permissible presence at his house due to their intent to search independently of the registry compliance check.[2]

Martinez argues that he had a right to privacy in the curtilage of his home, and the officers violated this right when they exceeded the investigatory nature of their interaction with him. Here, the trial court found no Fourth Amendment violation

---

[2] There is no merit to Martinez's claim that the officers and agents unlawfully entered his home prior to the search of the phone. The trial court implicitly rejected this claim in its finding of facts as to the chronological events that evening. Although generally we are limited to the factual findings in the trial court's order and cannot make additional factual findings, see *Williams v. State*, 301 Ga. 60, 61 (799 SE2d 779) (2017), the trial court here could not have discredited the officers' testimony and yet still concluded that the officers did not enter the house earlier or that Martinez did not give consent. Compare *Williams*, supra, 301 Ga. at 61.

8

because the officers were on the property to conduct the compliance review and had entered the property "just as any guest or mail man would." We agree.

A person's home and its curtilage are covered by Fourth Amendment protections. *Florida v. Jardines*, 569 U. S. 1, 6 (II) (A) (133 SCt 1409, 185 LE2d 495) (2013).[3] However, there is no Fourth Amendment violation when officers approach a house and its curtilage in a manner in which visitors would be able to do so. See *Kentucky v. King*, 563 U. S. 452, 469 (III) (D) (131 SCt 1849, 179 LE2d 865) (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak."); *State v. Criswell*, 327 Ga. App. 377, 381 (1) (759 SE2d 255) (2014). Thus, the officers did not violate Martinez's Fourth Amendment rights when they knocked on the door of

---

[3] Martinez contends that *Jardines* dictates that the officers here violated the Fourth Amendment because they remained on the porch (the curtilage) after completing the compliance check. We disagree. The officers' presence on the porch was permissible regardless of the reason. See *Walker v. State*, 314 Ga. App. 67, 70-71 n. 3 (722 SE2d 887) (2012) ("The deputy was entitled to approach the apartment, knock on the door, speak with the occupants at the doorway, and request identification even if he did not have reasonable suspicion at that point, given that these actions did not go beyond a first-tier consensual encounter.").

9

his home to conduct the sex offender registry compliance check. See OCGA § 42-1-12 (e), (i) (9). *Bowman v. State*, 332 Ga. App. 407, 408 (1) (773 SE2d 33) (2015) ("officers' initial approach to Bowman's house constituted a permissible, first-tier 'knock and talk' encounter"); *Walker v. State*, 314 Ga. App. 67, 70-71 n. 3 (722 SE2d 887) (2012) ("The deputy was entitled to approach the apartment, knock on the door, speak with the occupants at the doorway, and request identification even if he did not have reasonable suspicion at that point, given that these actions did not go beyond a first-tier consensual encounter.").

We also reject Martinez's claim that the officers violated his rights by exceeding the permissible purpose of the visit when they remained on the porch after the completion of the registry check. Even after the officers verified Martinez's information as part of the registry check, their interaction with Martinez remained a consensual first-tier encounter. And it was during this lawful interaction that the officers asked for consent to search Martinez's phone. Such conduct does not violate the Fourth Amendment.[4] See *Ware v. State*, 309 Ga. App. 426, 427-428 (710 SE2d

---

[4] Because the officers did not unlawfully search Martinez's home and their continued presence on the porch after the registry check was permissible, there is no merit to Martinez's claim that this allegedly unlawful conduct tainted his consent to search his phone.

627) (2011) ("Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search, as long as the police do not convey a message that compliance with their requests is required.") (citations and footnote omitted); *Carter v. State*, 319 Ga. App. 624, 626 (737 SE2d 724) (2013) ( "a request to search made during the course of a first-tier encounter does not transform the encounter into a second-tier . . . stop. It is clear that merely requesting consent for a search is not a seizure") (citation and footnote omitted); see also *Hall v. State*, 306 Ga. App. 484, 486 (2) (702 SE2d 483) (2010) ("The Fourth Amendment is not violated when, during the course of a valid [encounter], an officer questions the [defendant] and requests consent to conduct a search.") (citation omitted).

Martinez contends that the officers had a subjective intent to conduct a more thorough search using forensic equipment, and that if we consider their intent, under *Jardines*, the officers violated the Fourth Amendment. *Jardines*, however, is distinguishable.

In *Jardines*, the officers entered onto the defendant's porch with a drug-sniffing dog that alerted to the scent of drugs from the porch. *Jardines*, supra, 569 U. S. at 4 (I). In concluding that this was a "search" under the Fourth Amendment, id.

11

at 11-12 (III), the Court explained that "a stop or search that is objectively reasonable is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason." (Emphasis omitted.) Id. at 10 (II) (B). In such a case, "the question before the [C]ourt is precisely whether the officer's conduct was an objectively reasonable search." Id. The answer "depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered." Id. at 10 (II) (B).

In Martinez's case, the officers engaged in a legitimate first-tier encounter on the porch. They had been conducting similar checks throughout the evening. Although a forensic technician had accompanied them, the technician remained in the car while officers spoke with Martinez on the porch. The technician did not conduct a "search" until *after* officers discovered the images on Martinez's phone, a phone that they initially accessed with Martinez's consent. Cf. *Coleman v. State*, 337 Ga. App. 304, 310 (1) (c) (787 SE2d 274) (2016) (police officer's detection of marijuana did not constitute a "search" when the officer personally smelled the drug while on the porch during a knock and talk at defendant's home). Thus, unlike *Jardines*, which was a search from the very beginning, the officers' legitimate first-tier encounter on Martinez's porch did not constitute a Fourth Amendment search regardless of the

12

officers' alleged subjective intent. See *Jardines*, supra, at 10 (II) (B); *Whren v. United States*, 517 U. S. 806 (116 SCt 1769, 135 LE2d 89) (1996). We therefore conclude that *Jardines* does not require us to find that an unlawful search occurred based on the officers' presence on Martinez's porch.

*B. Whether Martinez's consent to the initial search was voluntary.*

We next turn to Martinez's argument that his consent to the search of his cell phone was not given freely and voluntarily.[5] We consider the totality of the circumstances in analyzing whether consent was voluntary. *Diaz*, supra, 344 Ga. App. at 299-300 (1) (b). In doing so, we are mindful that

> [m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans the privacies of life[.] The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the [Fourth Amendment] protection for which the Founders fought.

(Citation and punctuation omitted.) *Riley*, supra, 573 U. S. __ (IV).

_____

[5] Martinez's reliance on *Riley v. California*, 573 U. S. __ (III) (B) (1) & (III) (C) (134 SCt 2473, 189 LE2d430) (2014), holding that a search incident to arrest does not allow the search of a cell phone, is misplaced. The issue here is not that Martinez's phone was searched incident to his arrest, but rather that he consented to the search of his phone.

13

Here, the trial court found that the agent asked to "search" the phone, after which Martinez handed the agent his phone, showed her various applications on the phone, and assisted her in accessing the phone. The trial court identified the relevant factors to consider in viewing the voluntariness of a search, noted that there was no use of force or duress to obtain consent, and concluded that Martinez was not manipulated or tricked into giving consent. These findings are supported by the record and entitled to our deference. Thus, the trial court properly concluded that Martinez consented to the initial search of his phone.

*C. Whether the search exceeded the scope of the consent.*

Finally, we consider whether the search of Martinez's cell phone exceeded the scope of his consent. Martinez argues that the agent's request to view his phone was "informal and imprecise" and did not indicate the nature of the evidence the officers and agents sought, and thus the scope of his consent did not extend to opening applications on the phone and searching it using specialized forensic equipment. In considering Martinez's argument, we note that there were arguably two searches here – the agent's initial search while on the porch and the second search by the forensic technologist. We address each in turn.

14

(i) As to the initial search, we discern no error. As discussed above, we defer to the trial court's finding that the agent asked for consent to "search" and that Martinez gave this consent voluntarily. Moreover, Martinez was seated with the agent during this search, spoke with her about various applications on his phone, showed her some of the applications, and assisted her in accessing the phone. The agent observed the initial photo while viewing applications in Martinez's presence and with his consent. On these facts, the officer's discovery of the first image did not exceed the scope of Martinez's consent.

(ii) However, Martinez also argues that the forensic review of his phone after the agent found an image she believed to depict child pornography exceeded the scope of his consent. We conclude that we must remand for the trial court to make additional factual findings to enable appellate review of whether this forensic search exceeded the scope of Martinez's consent.

> When the State alleges that a search was conducted pursuant to consent, the State has the burden of proving the validity of the consensual search, and we "are required to scrutinize closely an alleged consent to search." In this regard, the intrusiveness of a consensual search—including the type, duration, and physical zone of the intrusion—is limited by the permission granted, and only that which is reasonably understood from the consent may be undertaken.

(Citations, punctuation, and footnotes omitted.) *New v. State*, 327 Ga. App. 87, 105 (4) (755 SE2d 568) (2014).

"[T]he scope of a search is generally defined by its express object." *Florida v. Jimeno*, 500 U. S. 248, 251 (111 S Ct 1801, 114 LE2d 297) (1991). The "touchstone" is reasonableness, specifically "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 250-251. As we have explained,

> [w]hen the consent of the person to be searched is the authority for the action, the scope of the consent must be measured by all of the circumstances and not only what a person says in response to a request. . . . The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?

(Citation and punctuation omitted.) *Springsteen v. State*, 206 Ga. App. 150, 152 (424 SE2d 832) (1992). As with other matters of consent, the State bears the burden to show that the search fell within the scope of the consent. Id. "[R]eviewing the reasonable scope of the search will largely be a fact-specific inquiry." *Hawkins v. State*, 290 Ga. 785, 788 (723 SE2d 924) (2012). However, the determination remains

16

a question of law that we review de novo. *State v. Sawyer*, 291 Ga. App. 462, 462-463 (665 SE2d 2) (2008).

Modern cell phones – or "smart phones" – present new and complicated issues for law enforcement seeking to conduct a search. Smart phones can hold a wealth of information reaching many different and personal areas of an individual's life, ostensibly leading to a greater invasion of privacy than a search of a person or place would usually entail. Indeed, the United States Supreme Court has recognized that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley*, supra, 573 U. S. __ (III) (B) (1). Our own Supreme Court has agreed that the "search must be limited as much as is reasonably practicable by the object of the search." (Citation omitted.) *Hawkins*, supra, 290 Ga. at 788.

Warrantless searches of cell phones is a developing area of law for our courts and must take into consideration the changing nature of technology and the corresponding ability of law enforcement to invade a person's privacy.[6] In the context of other types of searches, we have addressed the scope of consent based on the

[6] The U.S. Supreme Court recently held that a warrant is required to obtain cell-site records. See *Carpenter v. United States*, __ U. S. __ (138 SCt 2206, 2221 (IV)) (2018).

interaction between authorities and the defendant, focusing on what the defendant knew at the time he gave consent. For instance, where the suspect is told what police are looking for, or where police ask if there are any weapons, drugs, or contraband in the car, we have held that the consent extends to looking in closed bags or containers. *Varriano v. State*, 312 Ga. App. 266, 267-269 (718 SE2d 14) (2011). In contrast, we have held that a consent to a request to "look inside" a vehicle did not also encompass consent to look into closed containers in the car. *State v. Diaz*, 191 Ga. App. 830, 832 (2) (383 SE2d 195) (1989).

We have addressed the propriety of computer searches pursuant to consent in only a handful of cases. In *New v. State*, 327 Ga. App. 87, 104-106 (4) (755 SE2d 568) (2014), this Court upheld the search of the defendant's computer hard drive arising from the defendant's consent to search his home. There, the defendant, who was a police officer, was informed of the allegations against him and knew that the police were searching for illicit photographs. The defendant signed a written consent form, indicating that he knew the search could include any property in the house, and he specifically agreed that police could remove any material or property they wished. Id. at 104 (4). In holding that the search of the computer hard drive was within the scope of the defendant's consent, this Court pointed to the defendant's status as a

18

police officer, his knowledge of the investigation and the type of evidence at issue, the written consent, permitting police to remove any property they wished, and the defendant's intent to cooperate fully. Id. at 105-106 (4).

In this case, Martinez argued that the search exceeded the scope of his consent, but the trial court's order contains no factual findings on this issue. The trial court's order recites the following facts: "Defendant agreed to allow law enforcement to search his cell phone, at which point thumbnail images which appeared to depict child pornography were discovered. After confirming child pornography was on the cell phone, the Defendant was taken into custody." From there, the trial court concludes that "consent was freely and voluntarily given." There is conflicting evidence in the record regarding whether Martinez tried to halt the search, or if the forensic search was done in his presence on the porch. Nothing in the trial court's order, however, acknowledges or considers Martinez's argument that this forensic search exceeded the scope of any consent, and the order is silent as to factual findings that pertain to the scope of Martinez's consent.

Our Supreme Court has instructed that we may remand for further factual findings where the trial court's order lacks sufficient detail to enable appellate review. See *Hughes*, supra, 296 Ga. at 746 (1) n.6; see also *Williams v. State*, 301 Ga. 60, 61

19

(799 SE2d 779) (2017) ("Given the uncertainty in the trial court's order regarding the basis for its ruling, this Court must vacate the opinion . . . [and] remand this case to the trial court for further clarification on the specific findings that form the basis for its legal conclusions."). Given the fact-intensive nature of the analysis on the scope of consent, we conclude that the trial court's order lacks the factual findings necessary for us to fully review the scope of Martinez's consent.[7]

In summary, the trial court properly concluded that the officers were lawfully on Martinez's porch; that the officers were authorized to remain on the porch and ask if Martinez had any electronic equipment; and that Martinez voluntarily consented to the initial search of his phone.

The trial court, however, did not make any factual findings to enable appellate review regarding whether the subsequent forensic search exceeded the scope of Martinez's consent,. Therefore, we vacate the trial court's order and remand for the trial court to make additional factual findings on the limited issue of the scope of

---

[7] The officer's discovery of the first image do not create probable cause to allow another warrantless search. See *Caffee v. State*, 2018 WL 2089615, *4 (2) (a) (S17G1691) (May 7, 2018). And although the officers could have arrested Martinez after they observed the first image, they could not have searched the phone as a search incident to arrest. *Riley*, supra, 573 U. S. __ (III) (1) (B). Thus, the sole authority on which the officers conducted the forensic review of the cell phone was Martinez's alleged consent.

Martinez's consent. In light of our conclusion that remand is required, we do not consider the validity of Martinez's convictions.

*Judgment vacated and case remanded. Goss, J., concurs. Brown, J., concurs specially.*

A18A1051. MARTINEZ v. THE STATE.

BROWN, Judge, concurring specially.

I agree with the majority's conclusion that this case should be returned to the trial court for further findings on whether the police officers exceeded the scope of Martinez's consent. See *Hughes v. State*, 296 Ga. 744, 746 (1), n. 6 (770 SE2d 636) (2015). I write separately to provide additional guidance to the trial court about the factual findings it should make after this case has been remanded.

In *Hughes*, the Supreme Court of Georgia explained that "an appellate court generally must limit its consideration of the disputed facts to those expressly found

by the trial court. We must focus on the facts found by the trial court *in its order*,[1] as the trial court sits as the trier of fact." (Citations, punctuation and footnote omitted; emphasis in original.) Id. at 746 (1). See also *Williams v. State*, 301 Ga. 60, 61 (799 SE2d 779) (2017). It also recognized that where "the trial court has made express findings of fact, but not with sufficient detail to permit meaningful appellate review, an appellate court may remand for further findings. [Cit.]" *Hughes*, supra, 296 Ga. at 746 (1), n. 6.

In this case, the trial court's order includes no findings with regard to whether the officers exceeded the scope of Martinez's consent by using specialized equipment to conduct a forensic search of his cell phone, even though the issue was raised and extensively argued in post-hearing briefs. Instead, it merely concludes that "consent was freely and voluntarily given," that it did not result from "any kind of duress,

---

[1] I note that the trial court is not bound by the facts as recited by the majority opinion. For example, the majority states: "Using his equipment, the technologist conducted another search, which lasted, according to Martinez, about 30 minutes, and found more than 1,000 potential pornographic images on Martinez's phone." While the device was "hooked up" for approximately 30 minutes, one of the officers testified that the forensic analyst advised him after only five to seven minutes that "there was possibly up to 1,000 images." Additionally, I am not certain that the use of the forensic equipment should be characterized as an additional or second search; the issue is whether the use of the forensic equipment was within the scope of Martinez's consent.

2

force, or threat of force," and "that the Defendant is of an age and intelligence that he was not manipulated or tricked . . . into giving consent for the search of the cell phone."

Additionally, the trial court's factual findings lack sufficient detail for this Court to conduct meaningful appellate review of the scope of consent issue. The only findings relating to consent follow:

> When Defendant arrived to the door, law enforcement confirmed the information required by OCGA § 42-1-12. After verifying the information required by the registry, law enforcement asked Defendant if he had any electronic devices, to which he replied he had a cell phone. Defendant asked [his mother] to retrieve his cell phone from his bedroom, and she did. When [the mother] returned to the front porch with the cell phone, law enforcement asked if they could search it. Defendant agreed to allow law enforcement to search his cell phone, at which point thumbnail images which appeared to depict child pornography were discovered. After confirming child pornography was on the cell phone, the Defendant was taken into custody.

While the trial court's findings resolve the disputed issue of *whether* Martinez gave *any* consent, factual findings relevant to the scope of his consent are absent. For example, it is well-established in Georgia that "[a] consent search is one undertaken with knowledge and without objection by the defendant. Once consent is legally

3

obtained, it continues until it is either revoked or withdrawn."[2] (Citations and punctuation omitted.) *Woods v. State*, 258 Ga. 540, 542 (2) (371 SE2d 865) (1988). And it is equally clear that Georgia courts consider whether a defendant has withdrawn consent or objected to the scope of consent when considering whether the State has met its burden of showing a consensual search, particularly when the search takes place in the defendant's presence. See, e. g., *Lance v. State*, 275 Ga. 11, 20 (19) (560 SE2d 663) (2002); *Woods*, supra. Additionally, we have previously held that consent for "policeman to 'look,' must reasonably be construed to be consent to search, since it is not reasonable to imagine that the police intended any less; nor, therefore, when the police did thoroughly search or look can it be inferred that they improperly expanded the scope of the search." *Valenzuela v. State*, 157 Ga. App. 247, 248-249 (1) (277 SE2d 56) (1981). See also *McGaughey v. State*, 222 Ga. App. 477,

---

[2] I note that in *Springsteen v. State*, 206 Ga. App. 150 (424 SE2d 832) (1992), this Court stated, without citation to any authority, that "[t]he suspect is not required to call a halt when the search has gone beyond the scope of consent given; the burden remains on the State to show that the scope of the officer's search did not exceed the permission given." Id. at 152. While this statement is true with regard to the burden of proof, *Springsteen* should not, in my view, be interpreted to mean that the State cannot rely upon a defendant's failure to object or withdraw consent when attempting to meet its burden of proving consent. See *Lance v. State*, 275 Ga. 11, 20 (19) (560 SE2d 663) (2002); *Woods v. State*, 258 Ga. 540, 541 (2) (371 SE2d 865) (1988). I further note that none of our reported decisions have cited or relied upon this particular proposition from *Springsteen*.

4

479-480 (474 SE2d 676) (1996) (finding search of medicine bottle inside defendant's purse did not exceed scope of consent where "[a]ppellant did not indicate to the officers that they could only search her person or that they could not search inside the medicine bottle which contained the crack cocaine").

In this case, the evidence is in conflict with regard to whether Martinez attempted to withdraw his consent, as well as the location at which his telephone was connected to the forensic device. Additionally, the trial court made no findings about whether the phone was connected to a forensic device in Martinez's presence and whether he knew that the officers were searching for child pornography. One officer testified that he specifically recalled the female GBI agent "asking to search the phone, specifically or search the device," and that he had no knowledge of Martinez retracting his consent. Two officers testified that when the GBI agent took the phone from Martinez the second time and looked at a file, Martinez never asked her not do it, or stated that he did not want to give her his phone. Additionally, evidence was presented that the GBI agent stated directly in front of Martinez that there was "child porn on the phone" before it was handed to another agent and connected to the forensic device. One officer testified that after the GBI agent saw child porn on the phone, he "went and got that forensics fellow and he came back to the porch and

5

began with [the GBI agent] looking at the phone further." A different officer testified that the forensic analyst was waiting inside "the second vehicle in," meaning behind or beside another police vehicle that was also parked in the driveway and connected his device to Martinez's phone on the hood of the vehicle. The vehicle was "essentially right there" because the vehicles were parked "kitty-cornered."

Martinez's mother testified that after the GBI agent took the phone the second time, the agent "jumped" and took it to someone else near the hood of a truck. Martinez claimed that the officer grabbed the phone from his hand and "jumped in front of the porch to the car." He stated that "after she took it away from me, I was going to go retrieve it but I couldn't, the officer was trying to stop me. . . . He put his left hand in front of me." He also testified that he "asked but nobody answered the question why they wanted to see my phone and why they want to look at it for."

Based upon the conflicting and uncertain testimony about matters critical to a determination of the scope of consent, I agree with the majority's view that this case must be remanded to the trial court for findings of fact, as well as a ruling on the scope of consent.

6