**FIFTH DIVISION**
**PHIPPS, P. J.,**
**DILLARD and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 7, 2016**

# In the Court of Appeals of Georgia

A16A0555. THE STATE v. BOWMAN.

DILLARD, Judge.

Following a hearing, the trial court granted Philip Bowman's motion to suppress the results of a State-administered blood test. The State now appeals that ruling, arguing that the trial court erred in finding that Bowman did not voluntarily consent to the test. For the reasons set forth *infra*, we affirm.

At the outset, we note that when the facts material to a motion to suppress are disputed, "it generally is for the trial judge to resolve those disputes and determine the material facts."[1] This principle is well established, and our Supreme Court has "identified three corollaries of the principle, which limit the scope of review in

---

[1] *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015); *see also Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

appeals from a grant or denial of a motion to suppress in which the trial court has made express findings of disputed facts."[2] An appellate court generally must (1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit its consideration of the disputed facts to those expressly found by the trial court.[3] However, we review *de novo* the trial court's "application of law to the undisputed facts."[4]

So viewed, the record shows that shortly after 1:00 a.m. on January 26, 2014, a Gwinnett County police officer responded to a dispatch regarding a one-vehicle accident on a nearby road in Dacula. Upon arrival, the officer observed that the vehicle had driven off the road and hit a fence and some trees. The vehicle appeared totaled, but fire-department personnel already on the scene informed the officer that the driver, ultimately identified as Bowman, suffered only minor injuries. The officer

---

[2] *Hughes*, 296 Ga. at 746 (1); *see also May v. State*, 334 Ga. App. 807, 807 (780 SE2d 455) (2015); *Armentrout v. State*, 332 Ga. App. 370, 371 (772 SE2d 817) (2015).

[3] *Hughes*, 296 Ga. at 746 (1); *see also May*, 334 Ga. App. at 807; *Armentrout*, 332 Ga. App. at 371-72.

[4] *State v. Conner*, 322 Ga. App. 636, 637 (745 SE2d 837) (2013) (punctuation omitted); *see also Armentrout*, 332 Ga. App. at 372.

then spoke to Bowman and immediately noticed that he was unsteady on his feet and emanated a strong alcoholic-beverage odor. Based on these observations, the officer requested that a DUI task-force officer be dispatched to the scene.

Not long thereafter, the DUI task-force officer arrived and, upon making contact with Bowman, noticed the wrecked vehicle and that Bowman had a small cut on his forehead but otherwise did not appear seriously injured. The officer also noticed that Bowman had blood-shot eyes, slurred speech, and emanated a strong alcoholic-beverage odor. Additionally, Bowman was very unsteady on his feet, and thus, the officer had him sit on the bumper of the patrol vehicle while questioning him. During the officer's questioning, Bowman admitted that he had consumed several beers, that he was only twenty years old, and that his driver's license was still in his vehicle. At that point, the officer asked Bowman to perform certain field-sobriety tests. And although Bowman repeatedly muttered that he was "going to jail anyway," he allowed the officer to conduct the Horizontal Gaze Nystagmus (HGN) test, which indicated that he was impaired. The officer then asked Bowman to take a portable alco-sensor test, but Bowman refused, again stating that he was "going to jail anyway."

Based on all of his observations, the task-force officer determined that Bowman was under the influence of alcohol to the extent that he was a less-safe driver and placed him under arrest. The officer then read Bowman Georgia's implied-consent notice for drivers under the age of 21 two separate times and asked if Bowman would submit to a State-administered breath test, to which Bowman responded, "F*** it, man, why not?" However, while being transported to the jail, Bowman vomited on the back seat of the officer's patrol vehicle and, at one point, seemed to be choking. After determining that Bowman could breath, the officer took him inside the jail for booking. But upon observing Bowman, the nurse on staff refused to admit him and directed the officer to take Bowman to Gwinnett Medical Center for evaluation. Once there, the officer once again read the applicable implied-consent warning, and this time, asked if Bowman would submit to a blood test. Bowman, lying in a hospital bed, replied saying, "yeah, whatever you got to do." And subsequently, with the officer present, hospital personnel drew Bowman's blood for testing.

Thereafter, the State charged Bowman, via accusation, with driving under the influence of alcohol to the extent that he was a less-safe driver (DUI less safe),[5]

---

[5] *See* OCGA § 40-6-391 (a) (1).

driving under the influence of alcohol with an excessive blood-alcohol concentration (DUI per se),[6] driving with more than 0.02 percent blood-alcohol content while under the age of 21,[7] underage possession of an alcoholic beverage,[8] and failure to maintain lane.[9] Bowman subsequently filed a motion to suppress the results of the State-administered blood test, arguing, *inter alia*, that he did not voluntarily consent but merely acquiesced to the test.

During the hearing on Bowman's motion to suppress, only the responding police officers testified. Both agreed that Bowman appeared intoxicated and that, although he only had a small cut on his forehead, the damage to his vehicle showed that his collision was not insignificant. Nevertheless, the DUI task-force officer testified that Bowman did not appear to have difficulty understanding his questions or communicating generally. The State also played a recording, which was captured by the recording device on the dashboard of the task-force officer's vehicle and provided video and audio of the officer's interaction with Bowman at the scene and

---

[6] *See* OCGA § 40-6-391 (a) (5).

[7] *See* OCGA § 40-6-391 (k) (1).

[8] *See* OCGA § 3-3-23 (a) (2).

[9] *See* OCGA § 40-6-48 (1).

5

additional audio for a short period of time after Bowman was placed in the backseat of the patrol vehicle, during which Bowman made unprompted comments about playing basketball with his brother.

At the hearing's conclusion, the trial court took the matter under advisement. But one month later, the court issued an order granting Bowman's motion to suppress. This appeal follows.[10]

In its sole enumeration of error, the State contends that the trial court erred in granting Bowman's motion to suppress the results of the State-administered blood test, arguing that the court did not consider the totality of the circumstances in finding that Bowman did not voluntarily consent to the test. We disagree.

It is now well established that a suspect's right under the Fourth Amendment to be free of unreasonable searches and seizures "applies to the compelled withdrawal of blood, and the extraction of blood is a search within the meaning of the Georgia Constitution."[11] Generally, searches are of two types: "those conducted with a search

---

[10] *See* OCGA § 5-7-1 (a) (4) (permitting a direct appeal when the State's evidence has been ruled inadmissible).

[11] *Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015); *see also Cooper v. State*, 277 Ga. 282, 285 (III) (587 SE2d 605) (2003) ("A suspect's Fourth Amendment right to be free of unreasonable searches and seizures applies to the compelled withdrawal of blood." (punctuation omitted)).

6

warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions."[12] Accordingly, a warrantless search is "presumed to be invalid and the State has the burden of showing otherwise."[13]

One well-recognized exception to the warrant requirement in the context of a state-administered blood test is "the presence of exigent circumstances."[14] But in *Missouri v. McNeely*,[15] the Supreme Court of the United States rejected a per se rule that the natural metabolization of alcohol in a person's bloodstream constitutes an exigency justifying an exception to the Fourth Amendment's search-warrant requirement for nonconsensual blood testing in all DUI cases.[16] Rather, it held that

---

[12] *Williams*, 296 Ga. at 819; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (II) (91 SCt. 2022, 29 LE2d 564) (1971) (noting that searches conducted without prior approval of a judge or magistrate are per se unreasonable).

[13] *Williams*, 296 Ga. at 819; *see also Mincey v. Arizona*, 437 U.S. 385, 393-94 (I) (98 SCt. 2408, 57 LE2d 290) (1978) (noting that warrants are generally required to search a person's home or person).

[14] *Williams*, 296 Ga. at 819.

[15] 569 U.S. ___ (133 SCt 1552, 185 LE2d 696) (2013).

[16] *Id.* at 1556.

"while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, . . . it does not do so categorically."[17] And thus, whether a warrantless blood test of a drunk-driving suspect is reasonable "must be determined case by case based on the totality of the circumstances."[18] In this matter, however, the State does not argue that exigent circumstances supported drawing Bowman's blood, but instead, as previously noted, posits that Bowman consented to the test. Thus, we turn our analytical focus to the issue of consent.

It is similarly well settled in the context of a DUI blood draw that "a valid consent to a search eliminates the need for either probable cause or a search warrant."[19] Historically, Georgia's appellate courts considered "a defendant's affirmative response to the reading of the implied consent notice as sufficient to allow a search of his or her bodily fluids without further inquiry into the validity of the

---

[17] *Id.* at 1563 (II) (B); *accord Williams*, 296 Ga. at 821.

[18] *McNeely*, at 1563 (II) (B); *accord Williams*, 296 Ga. at 821.

[19] *Williams*, 296 Ga. at 821; *see also Cooper*, 277 Ga. at 291 (VI) (noting that a suspect's valid consent to search eliminates the need for either probable cause or a search warrant).

8

defendant's consent."[20] But in *Williams v. State*,[21] the Supreme Court of Georgia held that "mere compliance with statutory implied consent requirements does not, per se, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant."[22] Instead, the *Williams* Court concluded that the State must show that a suspect "gave *actual consent* to the procuring and testing of his blood, which would require the determination of the voluntariness of the consent under the totality of the circumstances."[23]

Specifically, under Georgia law, voluntariness must "reflect an exercise of free will, not merely a submission to or acquiescence in the express or implied assertion of authority."[24] Consequently,

> [t]he voluntariness of consent to search is measured by evaluating the
> totality of the circumstances, which includes factors such as prolonged

---

[20] *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016); *see, e.g.*, *Meiklejohn v. State*, 281 Ga. App. 712, 714 (637 SE2d 117) (2006); *State v. Lewis*, 233 Ga. App. 390, 392 (1) (504 SE2d 242) (1998).

[21] 296 Ga. 817.

[22] *Id.* at 822.

[23] *Id.* at 823.

[24] *State v. Austin*, 310 Ga. App. 814, 817 (1) (714 SE2d 671) (2011) (punctuation omitted).

9

questioning; the use of physical punishment; the accused's age, level of education, intelligence, length of detention, and advisement of constitutional rights; and the psychological impact of these factors on the accused.[25]

And while knowledge of the right to refuse consent is one factor to be taken into account, the government "need not establish such knowledge as the sine qua non of an effective consent."[26] Rather, the court should consider whether "a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter."[27]

In reviewing the record in this matter, including the video-recording of the DUI task-force officer's interaction with Bowman at the scene of the accident, there is no evidence that either officer threatened Bowman or prolonged his detention unnecessarily in an effort to obtain his consent to the blood test. However, the evidence did show that Bowman had been in a significant accident, suffered a cut to his head, and was so unsteady on his feet at the scene that the task-force officer

---

[25] *Id.* (punctuation omitted); *accord Kendrick*, 335 Ga. App. at 769.

[26] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (II) (B) (93 SCt 2014, 36 LE2d 854) (1973); *accord Kendrick*, 335 Ga. App. at 769.

[27] *Kendrick*, 335 Ga. App. at 769 (punctuation omitted).

directed him to sit on the bumper of the patrol vehicle while he questioned him. And as previously noted, Bowman was 20 years old at the time, but the task-force officer made no specific inquiries as to his level of education. In addition, following Bowman's arrest, the task-force officer read him Georgia's implied consent notice for drivers under the age of 21, but did not inform Bowman of his constitutional rights under *Miranda v. Arizona*.[28] And while the task-force officer testified that Bowman appeared to understand the implied-consent notice, his response to most of the officer's questions—which Bowman repeated numerous times during the encounter—was that nothing mattered and he "was going to jail anyway." Furthermore, both officers agreed that Bowman was significantly intoxicated during the encounter, and in fact, the evidence showed that he made nonsensical comments about playing basketball with his brother and vomited in the back of the patrol vehicle to the extent that he seemed to be choking. Indeed, upon arriving at the jail, Bowman's condition was such that the on-site nursing staff would not admit him and directed the task-force officer to take him to a nearby hospital.

Evaluating the totality of these circumstances, we are reminded that "in the absence of evidence of record *demanding* a finding contrary to the judge's

---

[28] 384 U.S. 436 (86 SCt. 1602, 16 LE2d 694) (1966).

11

determination, the appellate court will not reverse the ruling sustaining a motion to suppress."[29] And here, the evidence supports the trial court's findings and certainly does not demand a conclusion contrary to the court's ruling.[30]

Nevertheless, noting its legitimate interest in combating the deleterious effects of drunk-driving, the State argues that the trial court's mere consideration of whether Bowman's intoxication affected his ability to voluntarily consent allows DUI suspects to employ the very behavior the State is attempting to thwart as a shield to any prosecution of such behavior. But our Supreme Court has previously held that a trial court may consider a suspect's lucidity and ability to comprehend questions in determining whether that suspect's statements were rendered involuntary as a result of intoxication.[31] Thus, we see no logic to any argument that intoxication should not

---

[29] *State v. Durrence*, 295 Ga. App. 216, 218 (671 SE2d 261) (2008) (punctuation omitted); *accord State v. Stephens*, 289 Ga. App. 167, 167 (657 SE2d 18) (2008).

[30] *See Durrence*, 295 Ga. App. at 218 (holding that evidence that defendant was intoxicated and was not advised that he could refuse consent to search supported trial court's grant of defendant's motion to dismiss).

[31] *See Clay v. State*, 290 Ga. 822, 827-28 (1) (B) (725 SE2d 260) (2012) (holding that evidence supported the trial court's finding that defendant's first three statements to police were not voluntary based on testimony that when defendant made his first statement to officer while in the hospital he was severely intoxicated and could not appreciate his situation); *State v. Folsom*, 286 Ga. 105, 111 (4) (686 SE2d

also be a factor in determining whether a suspect's consent to a search is truly voluntary. Moreover, in its haste to condemn the trial court's ruling as an across-the-board preclusion of DUI per se prosecutions, the State neglects to mention that nothing in the court's ruling prevents the State from obtaining a warrant to draw a suspect's blood in situations, such as this, in which the voluntariness of a suspect's consent is difficult to determine. And while obtaining a warrant no doubt imposes more of a burden on police officers than simply reading the implied-consent notice, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."[32]

For all of the foregoing reasons, we affirm the trial court's order granting Bowman's motion to suppress the results of the State-administered blood test.

*Judgment affirmed. Phipps, P. J., and Peterson, J., concur.*

---

239) (2009) (concluding that it was permissible for trial court to consider defendant's lucidity and ability to comprehend questions as factors in determining whether a defendant's statement was rendered involuntary as a result of intoxication).

[32] *McNeely*, at 1561.