**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 22, 2025**

# In the Court of Appeals of Georgia

A25A0603. NEWMAN v. THE STATE.

LAND, Judge.

In this interlocutory appeal involving a DUI arrest, William Newman appeals the trial court's denial of his motion to suppress his blood test. Newman argues that the trial court erred in denying his motion to suppress without considering whether Georgia's implied consent laws are unconstitutional on their face and as applied. Newman also argues that the trial court erred in finding that law enforcement had reasonable probable cause to detain him, that officers did not unlawfully prolong the traffic stop, that Newman consented to the blood test, and in applying the *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), standard to Newman's OCGA § 24-7-702 challenge regarding an officer's administration of the HGN test rather than *Daubert*

*v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993). For the reasons discussed below, we affirm in part, vacate in part, and remand the case with direction.

"Following the grant or denial of a motion to suppress, we construe the evidence in the light most favorable to uphold the findings and judgment of the trial court." *Grimes v. State*, 303 Ga. App. 808, 808-809 (1) (695 SE2d 294) (2010). Moreover, we accept the trial court's findings of fact and credibility determinations if there is any evidence to support them. See id.

So viewed, the record shows that on November 20, 2021, the Kennesaw police department received two 911 calls about a black Ford truck impeding traffic. Officer David Hubbartt was dispatched to the scene. Meanwhile, Officer Kasmere Redvine and a trainee officer , the closest unit to the scene, responded first. When they arrived, the officers found Newman's truck, which was still running, stopped in the middle of Kennesaw 75 Parkway. Officer Redvine instructed the trainee officer to try to make contact with the driver while he directed traffic around the truck. Moments later, Officer Redvine also approached the driver's side of the truck and saw Newman, who appeared to be asleep at the wheel. The officers knocked on the window a few times

to wake Newman up and asked him to get out of the vehicle. Newman, who "seemed disoriented," rolled up the window instead. Officer Redvine knocked on the window again. When Newman rolled down his window, Officer Redvine reached in Newman's vehicle, opened the door, and ordered Newman to exit the truck. Officer Redvine testified that he wanted Newman out of the truck "because in some situations in the past, there have been people who have fallen asleep at the wheel, woken up and just taken off . . . the first thing we wanted to do was separate him from the vehicle." Newman exited the truck, and the officers questioned him about his alcohol consumption and his general condition. Officer Redvine noticed that Newman had an odor of alcohol on his person, glassy eyes, and slurred speech. Bodycam video from the officers showing the beginning of Newman's interaction with the officers was introduced during the motion to suppress hearing. The trainee officer did not testify.

Approximately three to five minutes later, Officer Hubbartt arrived at the scene and took over the investigation. Portions of Officer Hubbartt's bodycam footage were played during the hearing. Officer Hubbartt noticed that Newman had slurred speech, emitted an odor of alcohol, and had glassy, watery eyes. Newman stated that he had consumed alcoholic beverages earlier that day.

Officer Hubbartt then had Newman perform field sobriety tests, including horizontal gaze nystagmus ("HGN"), the walk and turn and one leg stand, and had him blow into a portable breathalyzer. Newman showed six out of six clues on the HGN, five clues of impairment on the walk and turn, three out of four clues on the one leg stand, and blew a positive result for alcohol on the portable breathalyzer. Officer Hubbartt then arrested Newman for DUI-Alcohol.[1] After placing Newman in the rear of his patrol vehicle,[2] Officer Hubbartt testified that he read Newman "verbatim" the implied consent notice for suspects ages 21 and over as required by OCGA § 40-5-67.1 (b) (2). He then requested a chemical test of Newman's blood. In response, Newman, in rapid succession, consented to have his blood tested, withdrew his consent, and then gave his consent again.[3] Newman was transported to the

---

[1] Officer Hubbartt issued three citations to Newman for impeding traffic (OCGA § 40-6-184), failing to maintain lane (OCGA § 40-6-48), and DUI- Alcohol 1ess safe (OCGA § 40-3-391 (A) (1)).

[2] Officer Hubbartt's bodycam footage indicates that the implied consent notice was read approximately 17 minutes after he arrived at the scene.

[3] Officer Hubbartt's bodycam footage shows Newman gave the following responses to Officer Hubbartt: "I have to submit to that right? . . . But I'm trapped if I say one or the other . . . You already have me in the back of a car . . . I guess I'll submit to yes because I mean I'm sitting in the back of the car now . . . I guess it doesn't really matter, it doesn't matter from what that says. Sure, I will submit to

Acworth City Jail, where his blood was drawn by a nurse . The blood samples were packaged and sent to the Georgia Bureau of Investigation's ("GBI") Division of Forensic Sciences blood laboratory. Newman did not request an independent test of his blood, breath, or urine at any point.

On December 2, 2021, Newman, through counsel, sent a letter to GBI advising that Newman was withdrawing "any and all assumed or purported consent to blood testing and blood analysis," and demanding return or destruction of the blood sample. GBI responded and informed Newman that his consent could not be withdrawn. Subsequently, a GBI forensic toxicologist tested Newman's blood, which showed that Newman's blood alcohol concentration was 0.156. Newman was charged with one count each of driving with an unlawful alcohol content (OCGA § 40-6-491 (a) (5)), driving under the influence of alcohol (OCGA § 40-6-391 (a) (1)), violation of minimum speed (OCGA § 40-6-184), and failure to maintain lane (OCGA § 40-6-48).

Newman filed motions in limine and to suppress the blood test results, challenging, among other things, whether officers had reasonable suspicion to stop and detain him, whether Officer Hubbartt had reasonable suspicion to perform field

whatever that says . . because the fact is . . . [.]"

sobriety tests, whether Officer Hubbartt had probable cause to arrest Newman, whether Newman gave consent and/or withdrew consent for the blood draw, and the constitutionality of the State of Georgia's implied consent scheme. After a hearing, Newman filed an additional memorandum in support of his motion to suppress. At a second hearing at which no additional evidence was presented, the trial court entered an order denying the motions. The trial court certified its decision for immediate review, and this Court granted Newman's application for interlocutory appeal.[4] This appeal followed.

1. Newman argues that the trial court erred in denying his motion to suppress on the basis that he consented to the blood draw without first addressing his constitutional challenges to Georgia's implied consent laws. Newman asserts that the trial court "misunderstood the law and [Newman's] constitutional challenges as being based solely on the argument that [Newman's] consent to a blood draw was unconstitutional as it was coercive because [Newman] was placed at risk of losing his

---

[4] Although Newman initially filed his application for interlocutory appeal in the Georgia Supreme Court, our Supreme Court found that it did not have jurisdiction in this case because the trial court "did not distinctly or by necessary implication rule upon any novel constitutional issue raised by" Newman. Accordingly, the application was transferred to this Court.

license." In its order, however, the trial court declined to address the merits of all of Newman's constitutional challenges. After explaining that Newman's motions "state that the State's implied consent scheme is unconstitutional on its face and as applied and that his consent to a blood draw was unconstitutional as it was coercive," the trial court concluded that "if [Newman] did voluntarily consent, then there is no need to evaluate [Newman's] constitutional challenges." "Because the trial court did not rule on the constitutional question[s], the constitutional issue[s] [are] not properly before this court." (Citation and punctuation omitted.) *Teasley v. Clark*, 361 Ga. App. 721, 722 (2) (865 SE2d 556) (2021).

2. Newman argues that the trial court erred in finding that the trainee officer had reasonable articulable suspicion to detain him and that he did not unlawfully prolong the traffic stop. Newman also argues that the State failed to prove that Officer Redvine was diligent in pursuing the mission of the stop because Officer Redvine "unlawfully trespassed inside" his vehicle when Officer Redvine reached inside the vehicle, grabbed the door handle, and opened Newman's door before ordering him to exit the vehicle. We disagree.

"The Fourth Amendment protects a person's right to be secure against unreasonable searches and seizures." (Citation and punctuation omitted.) *Sommese v. State*, 299 Ga. App. 664, 668 (1) (683 SE2d 642) (2009). "The burden of proof of establishing that appellee was not subjected to an illegal seizure of his person rests upon the State." *State v. Holler*, 224 Ga. App. 66, 69 (2) (479 SE2d 780) (1996).

> As this Court and our Supreme Court have explained many times before, encounters between police officers and citizens come in three varieties, at least as far as the Fourth Amendment is concerned: encounters involving no coercion or detention, which are outside the purview of the Fourth Amendment altogether; brief seizures, which require an officer to have a reasonable suspicion of criminal wrongdoing; and custodial arrests, which require probable cause.

(Citation and punctuation omitted.) *State v. Perry*, 349 Ga. App. 475, 476 (825 SE2d 902) (2019).

If a driver is impeding traffic, an officer has reasonable grounds to conduct a traffic stop. See *Whitmore v. State*, 289 Ga. App. 107, 109-110 (657 SE2d 1) (2008). An investigatory stop of a vehicle, however, "cannot be unreasonably prolonged beyond the time required to fulfill the purpose of the stop." (Footnote and punctuation omitted.) *Baggett v. State*, 367 Ga. App. 851, 857-858 (1) (b) (888 SE2d 636) (2023).

8

"It is well established that officers may, without unreasonably prolonging a stop, ask the driver to step out of the vehicle[.]" (Citation and punctuation omitted.) *McNeil v. State*, 362 Ga. App. 85, 89 (866 SE2d 249) (2021). See also *Rogers v. State*, 323 Ga. App. 647, 650 (747 SE2d 213) (2013) (as an extension of the constitutionally valid detention resulting from the traffic stop, an officer can order the driver and passengers out of the vehicle) (citation and punctuation omitted).

"An officer who questions and detains a suspect for reasons other than those connected with an original purpose of the stop exceeds the scope of permissible investigation unless he has 'reasonable suspicion' of other criminal activity." (Citations omitted.) *State v. Gibbons*, 248 Ga. App. 859, 863-864 (547 SE2d 679) (2001). However, "information learned during the course of a traffic stop may provide a law enforcement officer 'with reasonable, articulable suspicion to prolong the traffic stop.'" (Footnote and punctuation omitted.) *Baggett*, 367 Ga. App. at 858 (1) (b). "The specific articulable suspicion must be based on the totality of the circumstances – objective observations, known patterns of certain kinds of lawbreakers, and inferences drawn, and deductions made by trained law enforcement personnel." (Footnote omitted.) *Veal v. State*, 273 Ga. App. 47, 49 (614 SE2d 143) (2005).

Newman does not challenge the trial court's conclusion that Newman's act of impeding traffic provided the officers with reasonable grounds to conduct a traffic stop. See *Whitmore*, 289 Ga. App. at 109-110. Officers were therefore permitted to order Newman out of the vehicle. See *Rogers*, 323 Ga. App. at 650. Accordingly, the trainee officer's testimony was not necessary under these circumstances. See *Stadnisky v. State*, 285 Ga. App. 33, 37 (2) (645 SE2d 545) (2007) (rejecting defendant's argument that the State failed to prove defendant's initial encounter with police was a "first-tier" encounter because initial officer did not testify where "there were abundant objective circumstances . . . that would have authorized a seizure")

Moreover, Officer Redvine approached the driver's side of the truck only seconds after the trainee officer and saw that Newman appeared to be asleep inside the truck with it still running. When awakened, Newman ignored the officers' knocks and requests to exit the vehicle, instead choosing to roll up his window. Accordingly, under the totality of the circumstances – including Officer Redvine's observation that Newman was asleep at the wheel, Newman's behavior when asked to roll down his window and exit the vehicle, and Officer Redvine's prior experience with DUI suspects – we conclude that Officer Redvine's action of opening Newman's truck

door and ordering that Newman exit the vehicle was supported by reasonable articulable suspicion. See *Pierce v. State*, 319 Ga. App. 721, 723 (738 SE2d 307) (2013) (officer had reasonable suspicion to detain defendant when he found [defendant] asleep behind the wheel of a vehicle with the engine running, and she was unresponsive when he initially shined his flashlight inside her vehicle). Compare *Smith v. State*, 288 Ga. App. 87, 88 (653 SE2d 510) (2007) (trial court erred in denying defendant's motion to suppress where officers, who had not observed the defendant engage in any criminal activity or violate any traffic offenses, approached defendant's parked car, opened the car door, and asked the defendant to step out).

3. Newman argues that the trial court erred in finding that Newman consented to the blood test because the implied consent notice was coercive and because any purported consent was later withdrawn. We disagree.

"[I]t is well settled in the context of a DUI blood draw that a valid consent to a search eliminates the need for either probable cause or a search warrant." *Williams v. State*, 296 Ga. 817, 821 (771 SE2d 373) (2015). However, the mere reading of the implied consent notice does not constitute actual and voluntary consent. *Elliott v. State*, 305 Ga. 179, 221-223 (IV) (E) (824 SE2d 265) (2019). In determining whether

11

a suspect voluntarily consents to a search, the totality of the circumstances test is used to determine whether a defendant who has been read the implied consent notice thereafter voluntarily consented to a chemical test. See *State v. Henderson*, 356 Ga. App. 473, 476 (847 SE2d 833) (2020) ("it is clear that when a defendant seeks to suppress evidence of a chemical test, the appropriate inquiry remains whether the defendant's consent to the test was voluntary under the totality of the circumstances."). "A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent."(Citation and punctuation omitted.) *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016). "Other factors to be considered are prolonged questioning; the accused's age, level of education, intelligence and advisement of constitutional rights; and the psychological impact of these factors on the accused."(Citation and punctuation omitted.) Id. In determining voluntariness, "no single factor is controlling." *Olevik v. State*, 302 Ga. 228, 251 (3) (b) (806 SE2d 505) (2017).

(a) Newman argues that the trial court erred in finding that Newman consented to the blood test because the implied consent notice was itself coercive and because

Officer Hubbartt improperly advised him that his only options under the implied consent were "yes" and "no" without advising him that he could say yes and receive an independent test.[5]

> The determinative issue with the implied consent notice is whether the notice given was substantively accurate so as to permit the driver to make an informed decision about whether to consent to testing. Even when the officer properly gives the implied consent notice, if the officer gives additional, deceptively misleading information that impairs a defendant's ability to make an informed decision about whether to submit to testing, the defendant's test results or evidence of his refusal to submit to testing must be suppressed. The suppression of evidence, however, is an extreme sanction and one not favored in the law.

(Citations and punctuation omitted.) *State v. Chun*, 265 Ga. App. 530, 531 (594 SE2d 732) (2004). This Court has previously recognized that "Georgia's implied consent law offers two choices to DUI suspects: (1) submit to State-administered chemical testing with right to independent testing, if desired, or (2) refuse State testing,

---

[5] Newman's other arguments that he did not voluntarily consent because the implied consent notice was itself coercive and because he did not receive a Miranda warning are similarly unpersuasive. See *Olevik*, 302 Ga. at 252 (3) (b) (the reading of the implied consent "is not, by itself, coercive"); *Fofanah v. State*, 351 Ga. App. 632, 635 (832 SE2d 449) (2019) ("an arrestee is not, under Georgia constitutional or statutory law, entitled to *Miranda* warnings before deciding whether to submit to the State's request for a [blood] test") (citation and punctuation omitted).

suffering the attendant evidentiary consequences." (Citation and punctuation omitted.) *Hynes v. State*, 341 Ga. App. 500, 507 (801 SE2d 306) (2017).

Here, any indication to Newman that his only options under the implied consent were "yes" and "no" without advising him that he could say yes and receive an independent test was not misleading because it "did not constitute a substantive change that altered the meaning of the implied consent notice."[6] *McHugh v. State*, 285 Ga. App. 131, 134 (645 SE2d 619), 621 (2007). Officer Hubbartt read the implied consent notice "verbatim," which included the language that Newman could have a test done at his own expense and by a person of his choosing. See *Perano v. State*, 250 Ga. 704, 707 (300 SE2d 668) (1983) (an officer must inform a suspect at the time of arrest of his right to an independent chemical test). There is nothing in the record showing that Officer Hubbartt prevented Newman from requesting an independent blood test or that Newman requested one. Moreover, there was no evidence as to

---

[6] In any event, this Court has "held that the inclusion of misleading information in the implied consent notice does not render the notice unconstitutionally coercive on its face." (Citation and punctuation omitted.) *Losurdo v. State*, ___ Ga. App. ___ (912 SE2d 332, 334) (2025). Instead, "the appropriate inquiry is whether the defendant's consent to the [blood] test was voluntary under the totality of the circumstances." (Citation and punctuation omitted.) Id. As explained above, the trial court did not err in finding Newman voluntarily consented to the blood test based on the totality of the circumstances.

14

Newman's age, education, or intelligence. His detention was brief; approximately 17 minutes elapsed between Officer Hubbartt arriving on the scene and the reading of the implied consent notice. There was no evidence of any prolonged questioning, intimidation, fear, or threat of physical punishment. When Officer Hubbartt read the implied consent notice to Newman, Newman consented, withdrew that consent, and consented again. Thus, based on the totality of the circumstances, the trial court did not err in finding Newman voluntarily consented to the blood test.

(b) Newman also argues that he successfully withdrew any consent to have his blood tested when he sent the GBI a letter on December 2, 2021 revoking his consent prior to his blood being analyzed.

"As the term 'implied consent' indicates, every driver's consent to a chemical test for intoxication is implied by law." *State v. Stewart*, 286 Ga. App. 542, 544 (1) (649 SE2d 525) (2007). "Specifically, everyone who operates a motor vehicle in Georgia implicitly consents to the chemical testing of their bodily fluids in the event they are arrested for DUI, but they may revoke that consent by refusing to submit to such testing." Id. "[A]ctual consent to a blood draw is not 'implied consent,' but rather a possible result of requiring the driver to choose whether to consent under the

15

implied consent law." (Citation and punctuation omitted.) *Williams v. State*, 296 Ga. 817, 823 (771 SE2d 373) (2015). Thus, "in the context of a DUI blood draw . . . a valid consent to a search eliminates the need for either probable cause or a search warrant." *State v. Bowman*, 337 Ga. App. 313, 316 (787 SE2d 284) (2016).

In rejecting Newman's argument below, the trial court relied on *State v. Simmons*, 270 Ga. App. 301 (605 SE2d 846) (2004). In *Simmons*, the defendant consented to a State-administered blood test after his arrest for DUI, and he was transported to the hospital where his blood was drawn and submitted to the crime lab for analysis. Id. at 304 (Ruffin, J., concurring). Eleven days later, but prior to the blood analysis, the defendant wrote to the crime lab to withdraw his consent to the blood test. Id. at 301. The trial court granted the defendant's motion to suppress, finding that the defendant could withdraw his consent at any time before the blood sample was analyzed. Id. at 301. This Court reversed, concluding that the trial court's reasoning that a defendant is "entitled to withdraw his duly given consent to State-administered testing on the theory that chemical analysis of his blood sample had not yet begun, is . . . contrary to our implied consent law." Id. at 304. On appeal, Newman asserts that *Simmons* is not applicable because it was decided "before the

16

constitutional right to refuse intrusive warrantless blood draws was recognized."[7] See

*Olevik*, 302 Ga. at 233 (2) (a) ("Georgians do have a constitutional right to refuse to consent to warrantless blood tests, absent some other exception to the warrant requirement"). However, Newman has not shown why this would require a different outcome here, where, like in *Simmons*, Newman did not purport to withdraw his consent until 11 days after his blood was drawn. We see no meaningful distinction between this case and *Simmons*. Consequently, the trial court did not err in finding Newman's consent to the blood test was voluntary and that Newman could not withdraw that consent after submitting to a blood draw.

4. Newman argues that the trial court erred in applying the *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), standard to Newman's OCGA § 24-7-702 challenge regarding an officer's administration of the HGN test rather than *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993). We agree.

---

[7] Although Newman also argues that *Simmons* is physical precedent only, Judge Ruffin concurred fully in the majority's conclusion that the trial court erred when it granted the defendant's motion to suppress on the theory that chemical analysis of his blood sample had not yet begun. See *Simmons*, 270 Ga. App. at 301-306 (Ruffin, J., concurring specially) (defendant's attempt to withdraw his consent to blood testing several days after he allowed his blood to be drawn was "untimely and, thus, ineffectual").

In 2022, the General Assembly amended the Evidence Code "to extend to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert* and its progeny." *Smith v. State*, 315 Ga. 287, 300 (2) (b) n.6 (882 SE2d 300) (2022) (citing OCGA § 24-7-702). "Under that standard, a trial court must evaluate the reliability of the expert's proffered testimony[.]" Id. "[P]roper considerations include whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training." (Citation and punctuation omitted.) Id. Thus, the Supreme Court of Georgia has stated that "the *Harper* standard does not apply to cases tried after July 1, 2022." *Nundra v. State*, 316 Ga. 1, 15 (5) (b) n.5 (885 SE2d 790) (2023).

In its order denying Newman's motion to suppress, the trial court noted that "[t]he HGN test is generally accepted to have, 'reached a state of verifiable certainty in the scientific community and is admissible as a basis upon which an officer can determine that a driver was impaired by alcohol[,]'" citing *Spencer v. State*, 302 Ga. 133, 136 (805 SE2d 886) (2017). The trial court found that the State was still required

18

to meet a second component of foundation — that the tester substantially performed the scientific procedures in an acceptable manner. See *Duncan v. State*, 305 Ga. App. 268, 271 (2) (699 SE2d 341) (2010). The trial court then concluded that Officer Hubbartt performed the HGN test in an acceptable manner to support his conclusion that Newman was impaired. However, as the State concedes, "the trial court should have considered [Officer Hubbartt's] qualifications to testify as to the HGN test as well as the relevance and reliability of the proffered testimony based on the *Daubert* standard." *Garrison v. State*, 319 Ga. 711, 727 (3) (c) (i) (905 SE2d 629) (2024). Because the trial court did not do that here, we vacate this portion of the trial court's order and "remand the case for the trial court to exercise its discretion to determine under the correct standard, as set forth in OCGA § 24-7-702, whether the HGN testimony was properly admitted." Id. at 730 (3) (c) (ii).

*Judgment affirmed in part and vacated in part, with case remanded with direction. Mercier, C. J., and Dillard, P. J., concur.*